**HARRIS TRUST AND SAVINGS BANK, as former Trustee of the Sperry Master Retirement Trust No. 2 (and its successor, the Unisys Master Trust), and the Bank of New York, as Trustee of the Unisys Master Trust, Plaintiffs,**

v.

**JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant.**

**John Hancock Mutual Life Insurance Company, Third–Party Plaintiff,**

v.

**Chase Manhattan Bank, N.A., Counterclaim Defendant,**

and

**Sperry Corporation and the Retirement Committee of Sperry Corporation, Third–Party Defendants.**

**No. 83 CIV. 5401 (DC).**

United States District Court, S.D. New York.

Nov. 22, 2000.

Anderson Kill & Olick, P.C., by Lawrence Kill, John B. Berringer, Ann V. Kramer, Ann S. Ginsberg, Todd D. Robichaud, New York City, for Harris Trust.

Reboul, MacMurray, Hewitt, Maynard & Kristol, by Howard G. Kristol, Robert M. Peak, Jane M. Barton, Eric H. Jaso, Cheri M. McGilvery, New York City, for Hancock.

## OPINION

CHIN, District Judge.

In this case, the current and former trustees and sponsors of an employee retirement plan contend that defendant and third-party plaintiff John Hancock Mutual Life Insurance Co. ("Hancock"), a fiduciary of the plan, breached its obligations under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*

The case was tried to the Court. For the reasons that follow, judgment will be entered in favor of plaintiffs against Hancock to the extent set forth below. My findings of fact and conclusions of law follow.

### FINDINGS OF FACT

**A. The Parties**

Plaintiff Harris Trust and Savings Bank ("Harris Trust") is the former Trustee for the Unisys Master Trust, which is the successor to the Sperry Rand Master Retirement Trust No. 2. Plaintiff The Bank of New York ("BONY") replaced Harris Trust as Trustee for the Unisys Master Trust as of July 1, 1996. Counterclaim defendant and former plaintiff Chase Manhattan Bank, N.A. ("Chase") was a Trustee for the Sperry Rand Master Retirement Trust No. 2 in the 1970's and 1980's. Chase, Harris Trust, and BONY are hereafter referred to collectively as the "Trust-

ee." The Sperry Rand Master Retirement Trust No. 2 and its successor, the Unisys Master Trust, are hereafter referred to as the "Trust."

Third-party defendant Sperry Corporation is a successor to Sperry Rand Corporation. Sperry Corporation merged with Burroughs Corporation in 1986 to form Unisys Corporation. Sperry Corporation, Sperry Rand Corporation, and Unisys Corporation are hereafter referred to as "Sperry." Sperry is the sponsor of the Sperry Retirement Program and its successor, the Unisys Pension Plan (together, the "Plan").

Third-party defendant The Retirement Committee of Sperry Corporation (the "SRC") was a "named fiduciary" for the Plan. The duties previously performed by the SRC are now performed by the Pension Investment Review Committee (the "PIRC") of Unisys Corporation.

Defendant Hancock, an insurance company, is a holder of assets and a fiduciary of the Plan. *See generally John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,* 510 U.S. 86, 101–06, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) (holding that assets at issue in this case were "plan assets" and that Hancock was a fiduciary for purposes of ERISA).

## B. *Hancock's Group Contracts*

In general, during the relevant time period Hancock issued two types of group annuity or pension contracts: "participating" and "nonparticipating."

Holders of "participating" contracts participated in Hancock's overall investment experience, as deposits (or premiums paid to obtain retirement benefits) were commingled with other assets and investments in Hancock's "General Account." The General Account was used by Hancock to pay its operating costs and to satisfy its obligations to policyholders and creditors. The General Account also generated income as Hancock's general corporate assets were invested in different types of investments.[1] Hancock had the sole authority and discretion, with respect to its General Account, to set and execute investment policy and to allocate investment income, capital gains and losses, and expenses to particular lines of business, classes of contracts, and particular contracts.

Participation could be "dividend-rated" or "direct-rated." For dividend-rated contracts, investment income attributable to the contract, to the extent it was more favorable than interest assumptions incorporated into the contract, was distributed to the contract, in whole or in part, in the form of dividends. Hancock's Board of Directors annually voted, in its "dividend vote," to apportion and pay or allow a distribution of surplus with respect to eligible group annuity contracts and voted to adopt formulas for determining the distribution of such surplus. For direct-rated contracts, investment income attributable to the contract was directly credited to the contract's "fund."

Holders of "nonparticipating" contracts, such as Guaranteed Investment Contracts ("GICs") and Single Premium Annuity Contracts, were not entitled to share in the investment experience of the General Account. Instead, nonparticipating contracts usually contained a guaranteed rate of return or other similar type of guarantee.

In 1959, Hancock changed its method for allocating investment income by adopting the "investment generation" method, which tracked the net increase in the expe-

---

1. General Account funds were used by Hancock, *inter alia,* to invest in subsidiaries and to acquire and maintain "Home Office" properties, *i.e.,* the buildings, land, and physical plant maintained by Hancock for the operation of its own business. Hancock determined the rate or return on its Home Office properties on an annual basis, and allocated income and losses from such properties to its participating contracts (including the contract at issue in this case).

rience account of each contract for each year (the "cell").[2]

## C. *GAC 50*

In 1941, Hancock and Sperry entered into Group Annuity Contract No. 50 ("GAC 50") to fund a retirement plan for the benefit of Sperry employees. From its inception until December 31, 1967, GAC 50 was a dividend-rated participating contract. Since January 1, 1968, GAC 50 has been partially direct-rated and partially dividend-rated.

From its inception until December 31, 1967, GAC 50 was a deferred annuity contract. During this period, Sperry purchased deferred annuities from Hancock on an annual basis for each eligible employee. These annuities were payable to the employees (or their beneficiaries) upon their retirement.

Sperry paid Hancock premiums (which were deposited into Hancock's General Account and were sometimes referred to as "contributions") for each employee in accordance with purchase rate tables contained in the contract. In general, these tables incorporated three factors: (a) mortality rates that estimated actuarily (i) the probability that an annuitant benefit would be payable at each month following an annuitant's retirement at the assumed retirement age under the contract and (ii) if and when a death benefit would be paid; (b) an interest assumption for determining the "present value" of the stream of future benefits; and (c) a provision for future expenses, called "loading."

From its inception in 1941 until December 31, 1967, GAC 50 incorporated interest assumptions of 2% to 3%.

GAC 50 originally required Sperry to purchase deferred annuities annually from Hancock for all eligible employees. It also originally provided that, should Sperry cease making annual contributions to Hancock to purchase deferred annuities, the rights of eligible employees to the annuities already purchased would immediately become vested, even if such employees' rights to pension benefits had not yet vested under the Plan. Hence, Sperry was required to continue purchasing, on an annual basis, annuities for active employees or, if it ceased doing so, these employees' rights to pension benefits would immediately vest.

## D. *The 1968 Amendment*

GAC 50 was amended as of January 1, 1968 (the "1968 Amendment"). It was converted from a deferred annuity plan to a Retrospective Immediate Participation Guarantee ("Retro–IPG") form of contract. The deferred annuities purchased prior to January 1, 1968, were cancelled and the assets supporting them were placed in a Pension Administration Fund (the "PAF"). The cancellation of these pre–1968 annuities did not affect Hancock's guarantee of benefits to participants and beneficiaries.

In its Retro–IPG form, GAC 50 operated as follows: net investment income from Hancock's General Account was directly credited to GAC 50's PAF on an annual basis. The amount credited depended upon the investment performance of Han-

2. The "investment generation" method credited each cell with the rate of return for General Account assets acquired by Hancock in the original investment year, adjusted for "rollover," which included the maturity, sale, call, and elimination through default of assets. As original investments matured, or "rolled over," rates of return on new investments made with the proceeds would affect credits to the cell for the original investment year. Since 1959, Hancock has used the investment generation method to allocate net investment income to the experience accounts and direct-rated funds of its Group Pension participating contracts. Through the investment generation method, Hancock allocated income, capital gains or losses, expenses, and taxes to lines of business participating in the experience of its General Account. The same method was used by Hancock to make allocations to Immediate Participation Guarantee, or "IPG," contracts. For a given year, the average of the rates of return for each cell, weighted to reflect the size of each cell for a particular contract, was referred to as the contract's "case rate." (ASF ¶¶ 20–22).

cock's General Account and the allocation of the performance to the PAF.

The 1968 Amendment required Hancock to maintain the PAF at a level sufficient to meet the "Liabilities of the Fund" (the "LOF") as computed by Hancock. The LOF is the contractual reserve for the pension benefit obligations guaranteed by Hancock. For the pre–1968 cancelled annuities, the LOF was computed assuming rates of return of 2.5 or 3%, depending on when the benefits were first guaranteed, and using the 1937 Standard Annuity and 1951 Group Annuity Mortality Tables, with specified adjustments to reflect mortality improvement.

The 1968 Amendment also required the PAF to be maintained at a "minimum operating level" (the "MOL") of at least 105% of the LOF. Amounts in the PAF in excess of the MOL were referred to as "free funds."

If the PAF balance fell below the MOL, or if the Trustee sought to remove the "free funds" through GAC 50's transfer provisions, the PAF would automatically terminate and GAC 50 would cease to function as a Retro–IPG. Hancock would "repurchase" the cancelled pre–1968 annuities at the original 2½ to 3% interest rates and the contract would revert back to a deferred annuity form. (PX 25 at Art. III, §§ 7, 9; Tr. 764–67). As a practical matter, removal of the "free funds" pursuant to the transfer provisions was not a viable option for the Trustee, for such a lump-sum transfer would have been prohibitively expensive because of the low interest rate assumptions used to price the "repurchased" annuities. (Tr. 150–51). Transfer under the contract also was also unattractive from the Trust's perspective because any such transfers were subject to an Asset Liquidation Adjustment ("ALA"), an adjustment to the amounts transferred to account for investment losses (or gains) to Hancock resulting from the liquidation of any assets. (PX 25, Art. III, § 9). In late 1981, Hancock estimated the ALA for GAC 50 transfers to be 39.4%, a figure

that the Trust believed was excessive. (PX 561, 596; Tr. 728–29).

The 1968 Amendment also provided additional benefit payments to be guaranteed by Hancock. Upon the retirement of an eligible employee after 1968, Hancock would determine the amount by which the LOF would increase if the portion of the retirement benefit for the period after January 1, 1968, were to be "guaranteed" by Hancock. If GAC 50's PAF balance exceeded the MOL based on the increased LOF, Hancock would guarantee the payment of the additional pension benefits. Under the 1968 Amendment, Hancock had the right after 1972 to change these rate tables, but the new table would apply only to benefits guaranteed after the effective date of the change in the tables.

The 1968 Amendment also created a "Contingency Account," consisting of funds associated with GAC 50 to be held in Hancock's General Account. Since January 1, 1968, all investment income attributable to the Contingency Account has been allocated to GAC 50's PAF.

The 1968 Amendment also provided that Hancock would credit the PAF annually with the PAF"s share and the Contingency Account's share of the net interest earned and apportioned to Hancock's Group Pension line of business, less 1% of such share.

Hancock has maintained a record, known as "Account 9," which included the amount of the risk charges in excess of one percent of net interest that would have been allocable to GAC 50 under Hancock's annual risk charge votes but for the 1% provision. The Account 9 record also included, among other things, the amounts of net interest, realized capital gains and losses, and taxes that would have been allocated to Hancock's unallocated surplus had the risk charges in excess of 1% of net interest been charged to GAC 50.

The 1968 Amendment also required Hancock to determine as of December 31 of each calendar year commencing January 1, 1968, the LOF and the amount (if any)

the PAF exceeded the LOF. From 1968 to at least the time of trial, Hancock reported GAC 50's PAF balance to Sperry or the Trust on an annual basis. Since 1968, Hancock has maintained a record of GAC 50's experience account, or "asset share," which consists of the PAF and Contingency Account balances and also reflects the balance of Account 9. The experience account so recorded was never used for allocating experience to the contract's PAF and Contingency Account.

Since January 1, 1968, GAC 50's LOF has been equal to or greater than its PAF balance. Since at least the early 1970's, the PAF balance in GAC 50 has exceeded the MOL (and thus the LOF).

### E. *The 1977 Amendment*

GAC 50 was amended again as of August 1, 1977 (the "1977 Amendment"). The 1977 Amendment converted GAC 50 to a Retrospective Immediate Participation Guarantee/Prospective Deferred Liability ("Retro–IPG–PDL") form of contract. Under this amendment, the LOF would not be automatically increased upon the retirement of an employee, and new retirement benefits would not be guaranteed by Hancock. The SRC had the right to ask Hancock to guarantee benefits for retirees, but in fact it did not do so.

The 1977 Amendment permitted the SRC to designate employees to receive non-guaranteed benefits using the "free funds" in the PAF. The Plan remained ultimately responsible for the pension liability to such individuals; the payment risk was not shifted to Hancock.

On the effective date of the 1977 Amendment, the automatic addition of new guarantees ceased. (PX 25, Amendment No. 17). Since then, Sperry has never asked Hancock to guarantee any additional annuities, so the population of retirees has been frozen. (Tr. 1337–38, 1369). The LOF decreased while the PAF continued to increase. (Tr. 1338–39; PX 1244).

### F. *The Use of Free Funds*

The gap between the LOF and GAC 50 assets (the PAF plus the Contingency Account) was $22 million at year-end 1981 and $56 million at year-end 1987, according to Hancock's numbers. (PXs 1241, 1242, 1244). According to Sperry, the "true" excess, as of year-end 1981, was more in the vicinity of $38 million to $50 million or more. (PXs 1240, 1241; *see also* PX 561, 621D; Tr. 731). In short, Hancock was retaining more funds in its General Account with respect to Sperry pensioners and employees than was necessary, and the issue arose as to what to do with the excess, or free funds.

After the 1977 Amendment, the SRC did designate employees to receive non-guaranteed benefits. Hancock paid such benefits out of the free funds of the PAF through June 1982. Free funds were also withdrawn from the PAF on other occasions, using a "rollover" procedure that Hancock had adopted in 1972 to permit contractholders to withdraw a portion of excess funds without any "market value adjustment" to account for differences between the "book" and "market" value of General Account assets.

From the late 1970's on, the SRC sought to reduce the amount of Plan assets invested in Hancock's General Account as it changed its investment strategies. It sought to shift, to some extent, from the kind of fixed income investments generally purchased with insurance company General Account funds to equity investments. The SRC also was dissatisfied with the rate of return from Plan assets invested in Hancock's General Account; Thomas Hirschberg, for example, believed that income to the Plan could be increased by transferring free funds into "other media." (Tr. 1513). Richard Raskin, an actuary who provided pension advice to Sperry during the period in question, confirmed that the SRC felt it could "do better" in terms of investing by getting the excess funds back, and he noted also that the SRC had an obligation under ERISA to

"maximize the investment return." (Tr. 712–13).

On three occasions, in 1977, 1979, and 1981, the Sperry Trust withdrew funds—a total of approximately $12 million of Plan assets—from the PAF's accumulated free funds, using the rollover procedure. The SRC transferred these amounts to the Plan's other money managers.

In 1982, the SRC attempted again to use the rollover procedure to withdraw accumulated free funds, but Hancock refused to let the SRC do so, citing its own cash-flow needs. (ASF ¶¶ 77–79; Tr. 1488–89, 1607–13, 1689–90). The SRC then attempted to withdraw accumulated free funds to pay non-guaranteed benefits, but Hancock provided notice that it would no longer pay non-guaranteed benefits under the Retro–IPG–PDL (as it had been doing through June 1982). (PX 662; ASF ¶¶ 83, 84; PX 675; Tr. 811–12, 894–96, 1325). As a consequence of Hancock's refusals to permit such access to "free funds," the only mechanism available for the SRC to withdraw "free funds" were the transfer provisions of GAC 50. Again, however, that was not a viable option because of the pricing scheme.

Hancock did not consider its obligations under ERISA to the Plan when it decided to terminate the rollover procedure or the payment of non-guaranteed benefits with excess funds. (Tr. 1352–54). Instead, it used Plan assets for its own benefit: to help address its own cash flow problems, as "one more way of limiting cash out-flows." (Tr. 1612; *see* Tr. 736; *see also* PX 593). In addition, by refusing to per-mit the withdrawal of "free funds," Hancock was able to continue collecting charges on the investment income generated by these funds. (Tr. 313–14). There was no question that the "free funds" be-longed to the Trust; the issues confronting the parties were how to compute the amount of the excess funds, when Hancock had to give them back, and under what circumstances. (*See* Tr. 752–54).

Throughout this period, Hancock as-sessed the Trust risk charges. Hancock did not actually face any risk with respect to the free funds during this time period, however, because it was "sufficiently pro-tected" by other provisions of GAC 50 so that it was not at "material risk." (Tr. at 313–14, 343–44, 401–02). Therefore, the excess risk charges collected by Hancock during this time period constituted over-compensation.

## G. *Revaluation*

For some years prior to 1981, Sperry had been questioning Hancock on whether it was willing to revalue annuities to reflect changes in interest rates. (PX 449). Han-cock's response was that its "policy" was to continue to value the annuities "on the basis on which they were originally pur-chased." (*Id.*). Hancock itself recognized, however, that there was a problem in us-ing the original rates:

Interest rates have risen dramatically over the last several years and have risen gradually over a much longer peri-od. Over these periods the case earn-ings rate of most of our retro IPG con-versions and issue IPG's has risen as well. However, most of these contracts contain fixed interest, mortality, and loading assumptions for a major portion of the LOF. The rise in case rates has resulted in sizable differences between the case rate and the various interest assumptions of the LOF, especially for canceled annuities. The difference ap-proaches 5% in some instances. The current size of such differences has re-sulted in numerous customer complaints that LOF amounts are absurdly conser-vative and should be revalued using higher interest rates.

(PX 572). In an internal memorandum addressing the issue, Hancock recognized that "[f]ar greater margins exist in LOF amounts than were imagined when the fixed LOF basis was established, and we should pass these prospective gains on faster than we are doing now." (*Id.*). The

memorandum showed, however, that Hancock was motivated by self-interest: "If we revalue and charge for it, John Hancock has increased profit potential."

At a meeting in December 1981, Hancock presented to Sperry a number of "possible contractual changes" that it was considering, including a change in the interest rate assumptions used to calculate reserves. (PX 593, at 4). In return, however, Hancock indicated that it would want an "up-front charge" of 10% of the difference between the reserves calculated on the new basis and the old basis. (*Id.* at 5). Sperry's reaction to the proposed 10% charge was that it was "[h]ighway robbery." (Tr. 750). Hancock confirmed at the meeting that its motivation was self interest, as Hancock's senior representative at the meeting began by stating that "Hancock was losing money in the individual health line of business and, in essence, the group pension or group annuity line of business was going to pay for that." (Tr. at 736).

After a follow-up meeting on January 13, 1982, at which Hancock confirmed its "recognition that the liabilities [had] been overstated" (PX 611), Hancock made a formal revaluation proposal on February 12, 1982, offering to revalue GAC 50's liabilities, thereby reducing the amount necessary to pay guaranteed benefits. (PX 626). The proposed new LOF assumptions were "an improvement," but they were still "more conservative than they needed to be." (Tr. at 543–44; *see* PX 1241).

Significantly, the proposal did not modify the transfer provisions, and thus Sperry would not be able to transfer excess funds out of the general account without terminating the contract. (Tr. at 742, 801–02, 1513–14; *see* DX 1594, PX 611). In addition, the proposal included a "special risk

charge" to be paid to Hancock "as consideration" for its increased risks. (PX 626). Principally for these reasons, Sperry rejected the revaluation proposal. (Tr. 764–67, 803). Sperry's rejection of the revaluation proposal was reasonable. (Tr. 166–67, 578–81).

In sum, the circumstances surrounding Hancock's revaluation proposal demonstrated that it recognized that it was holding reserves far in excess of the amount necessary to cover liabilities, that it had the discretion to revalue the liabilities to reduce the amount necessary to be held in reserve, and that it refused to do so on terms more favorable to the Trust because of its own self-interest.

## H. *The 1988 Amendment*

In 1988, after the filing of this action, the Plan was amended again, to permit the Trustee to freely transfer "free funds" out of Hancock's General Account without triggering the termination of the PAF and Hancock's "repurchase" of the pre–1968 deferred annuities (the "1988 Amendment"). Pursuant to the 1988 Amendment, the Trustee requested the transfer of more than $53 million in "free funds" out of the PAF.

## I. *Hancock's Investment and Allocation Decisions*

### 1. *Fixed and Frozen Assets*

From at least as early as 1976, Hancock routinely invested Plan Assets in its own home office properties, *i.e.*, the buildings, land, and physical plant maintained by Hancock for "its own occupancy" for the operation of its business, as opposed to properties acquired solely for investment purposes. (Tr. 218). Hancock charged itself "rent" for the use of this property, thereby generating investment income.[3] Hancock determined the rate of return on

---

**3.** Hancock used the term "fixed and frozen" to refer to the assets in question. (Tr. 220). Hancock made certain adjustment to the rates of return on the fixed and frozen investments; these adjustments were part of a process referred to as "scaling," by which Hancock "distributed" the effect of short-term investments, uninvested funds, and fixed and frozen assets by proportionate adjustments to long term rates of yield. (Tr. 221; PX 353).

these "investments" in its own assets and it allocated income and losses from these investments to its participating General Account contracts, including GAC 50. Hancock invested a greater proportion of its assets in home office properties than most other comparable insurance companies. (PX 353). The resulting rates of return were consistently lower in many years than the return on other investments made by Hancock for its customers. (Tr. 220–21, 232). Hancock recognized this problem itself as early as May of 1977 when it observed in an internal memorandum:

> Particular attention was given to the fixed and frozen component of "scaling" which changed significantly in 1976, primarily due to the adverse effect of the investments in the Home Office complex. This adverse effect on interest rates is expected to continue and possibly worsen in 1977.... Notable was the fact that John Hancock (of the 12 listed insurance companies) has, except for Travelers, the largest proportion of admitted assets in Home Office properties (1.11% in 1976 versus Equitable's .30%) and, except for Mutual of New York, the lowest rate of return on such properties (–6.69% in 1976 versus Equitable's +4.84%).

(PX 353; see Tr. 226; see also PXs 899 at 1, 900, 901, 914, 1042). Hancock also recognized itself that one of the reasons for the low yield was that Hancock was "charging itself rental rates below the market rates." (PX 351). In addition, two of the buildings in question had low occupancy rates, and the properties had high operating expenses. (Id.).

The manner in which Hancock allocated the investment income for the fixed and frozen assets benefited other lines of business within Hancock at the expense of the group pension line. Group pensions is a line that accumulates a great deal of assets but is comparatively inexpensive to operate, while group insurance, for example, accumulates smaller levels of assets but

generates high expenses because it requires more personnel and office space to handle the higher amounts of paperwork. (Tr. 231).

In addition, Hancock chose not to allocate any portion of Hancock's investment in fixed and frozen assets to the Guaranteed Benefit Separate Account (the "GBSA"), the portion of the general account from which virtually all new nonparticipating group pension contracts were sold since 1980. (Tr. 1547–48, 1624). In the participating group pension contracts, the policyholders bore the investment risk; in contrast, Hancock bore all the investment risk with respect to GBSA contracts. As a consequence, the GBSA contracts were not saddled with the lower rate of return. An August 7, 1985 internal Hancock memorandum noted that there was higher negative scaling for participating contracts than for non-participating contracts and observed: "It does not seem reasonable to have the negative scaling for fixed and frozen assets vary even slightly between the two segments." (PX 877, at 3; see also Tr. 251–52, 1547–48).

Hancock's own group pension actuary, Henry Winslow, and others at Hancock repeatedly questioned the manner in which Hancock was allocating fixed and frozen income to the group pension line. In the early 1990's, Winslow repeatedly argued that the allocation procedures resulted in unacceptable shortfalls of income for the group pension line, and noted that this had the effect of "confound[ing]" customer expectation that the general account was primarily a fixed income investment. (PXs 899, 900, 901, 902, 907, 914; see also Tr. 1527–29 (Winslow acknowledging that group pension should have gotten additional income), 1541 (Winslow acknowledging that from 1977 to time of trial Hancock's investments in home office properties had driven down the rate of return on GAC 50 assets)). The minutes of the November 30, 1992 meeting of the Hancock Group Pension Profit Center Board of Directors read as follows:

The current corporate investment generation methodology for Fixed and Frozen continues to be a burden for Group Pensions. The shortfall of over 60 basis points implies a shift into equity investments; whereas par [participating] clients expect the par general account's investments to be primarily fixed income. Group Pension should continue to work with corporate to ameliorate this situation.

(PX 907).

Hancock did not, however, significantly change its manner of allocating fixed and frozen income after 1977 and the rate of return on the home office properties was lower than the rate of return on other investments in subsequent years as well. (Tr. 232, 244). By 1994, the shortfall for fixed and frozen assets had reached 70 basis points; yet, Hancock failed to make any change in its methodology. (PX 1042).

Hancock's investments in fixed and frozen assets also included investments in its own subsidiaries, and likewise Hancock realized returns on these investments, which were allocated across its assets as with the other fixed and frozen investments. This continued into the mid 1990's. (Tr. 232–33). These investments resulted in reduced investment income. (*See* PX 583 ("One half of this drop reflects the decision to supply $200 million to our Variable Life subsidiary."); PX 878 at 5 (" [T]he fixed and frozen portion of this item includes our subsidiary, John Hancock Property & Casualty, which experienced a large reduction in market value in 1986.")).

In deciding to invest Plan Assets in its own properties and subsidiaries and in determining how to allocate income and what adjustments to make, Hancock was exercising its discretion. (Tr. 1664–66).

### 2. *Third–Year Drop*

From 1970 to 1977, to improve its "new money" rate, Hancock adopted a policy of imputing to new common stock purchases the yields it was earning on its bond and mortgage portfolios during the first two years after the common stocks' purchases. In other words, Hancock decided to assume that stocks would earn the same yield as bonds in the first two years following their purchase, even though common stocks actually yielded a lower rate of return. Hancock knew, at the time, that this decision would penalize contracts with largely pre–1970 contributions, such as GAC 50, while permitting Hancock to improve artificially its "new money rate" to help it attract new customers. (Tr. 270–71, 275–76, 278–83; PX 122, 126). Because the yield on stocks did not increase, Hancock made adjustments every third year to reconcile. (Tr. 271–72; PX 1248).

The net effect of Hancock's policy was to reduce the rate of return allocated to GAC 50 and other participating contracts, as Hancock artificially increased the "new money rate" for new investments by taking investment income properly allocable to older contracts like GAC 50 and using it to improve the rate of return on new business.

The actions with respect to the "third year drop" occurred prior to July 20, 1977.

### 3. *The Cost of Borrowing*

During certain years Hancock borrowed money and allocated the cost of the borrowing to different lines of business, including group pension. The group pension line of business, however, was always profitable and the cash flow associated with GAC 50 was always positive. Hence, GAC 50 and other group pension contracts were required to share the burden of the borrowing even though the loans were necessitated not by group pension but by other lines of business within Hancock. (Tr. 257–61; PX 1200A). Hancock could have allocated this expense just to the lines of business that required the loans, but it chose instead to allocate the costs of borrowing funds to other lines as well, including group pension.

#### 4. *Indirect Expenses*

Hancock also allocated certain "indirect expenses" to GAC 50, including (a) a portion of the litigation costs of the instant case, (b) a portion of the expenses incurred by Hancock in lobbying Congress to amend ERISA to relieve Hancock and other insurers of the fiduciary duties that the courts in this case have held ERISA imposes on them, and (c) a portion of expenses relating to contracts other than GAC 50. (Tr. 296–97, 1397, 1440–41, 1552–54; 1567–68; PX 904; *see also* Tr. 1440–41). These practices were inappropriate, and Hancock should have used its own surplus to pay for these items. (Tr. 297).

#### 5. *Segmentation (Par v. Non–Par)*

In 1982, Hancock segmented its General Account into subaccounts, each with its own investment policy. One of the segments was the Pension Participating Segment, which was applicable to GAC 50, and another was the Pension Non–Participating Account. For the 1982 investment year, Hancock allocated higher yielding investments to its own nonparticipating business than it allocated to participating contracts such as GAC 50. (Tr. 305). Hancock benefitted from this allocation, to the detriment of the participating segment, including GAC 50. (Tr. 305–07).

#### 6. *Income Tax Allocations*

Hancock allocated federal income tax to GAC 50 in such a manner that GAC 50 was charged for taxes generated by other contracts. Beginning in 1984, mutual life insurance companies were taxed on their surplus, or what could loosely be called "operating profit." The tax attributed to the participating segment of the group pension line was based upon the total allocated and unallocated surplus associated with that line, while within the line the tax

---

was allocated to each participating contract not on the basis of the surplus but using its investment contribution base. In the case of GAC 50, the allocation was based on GAC 50's entire PAF, rather than the much smaller Contingency Account. (Tr. 309–11). If Hancock had allocated the tax on the basis of surplus within the line as well, GAC 50 would have borne a lower share of the tax. As McCarthy explained it:

> [I]n effect, Hancock took the tax, split it into two pieces, allocated one piece of it the way the tax was actually borne and the other piece across the asset bases of the contracts, without regard to whether they had surplus or not or how much.

(Tr. 311).

At trial, the Plan's expert witness in this respect acknowledged that the Plan's damages would disappear in the event Professor Ibbotson's damages calculations were accepted. (*See* PX 1237).[4]

### *PRIOR PROCEEDINGS*

This action was commenced on July 20, 1983. The Trustee alleged that Hancock was an ERISA fiduciary with respect to the free funds and that Hancock had breached its fiduciary duties by, *inter alia*, not permitting the Trustee to withdraw free funds. Hancock responded principally by arguing that it was not an ERISA fiduciary with respect to the free funds.

In 1988, the parties filed summary judgment motions. In 1989, Judge Patterson, to whom the case was then assigned, granted summary judgment dismissing the Trustee's ERISA fiduciary claims, holding that Hancock was not an ERISA fiduciary with respect to any assets of GAC 50. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 722 F.Supp. 998 (S.D.N.Y.1989). Judge Patterson later dismissed the Trustee's remaining breach

---

4. At trial, the Trust offered evidence with respect to another item of claimed damages called "other scaling." (*See, e.g.,* Tr. at 262–66, 1012–17). The Trust, however, only offered a "hypothesis" (Tr. at 265), and it failed to demonstrate a *prima facie* case in this respect. Accordingly, I am not persuaded that Hancock breached its obligations under ERISA with respect to "other scaling."

of contract and tort claims. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 767 F.Supp. 1269 (S.D.N.Y. 1991).

On appeal, the Second Circuit reversed in part and affirmed in part. It held that Hancock was an ERISA fiduciary with respect to the "free funds" portion of GAC–50, as to which benefits were not guaranteed, and that therefore Hancock was subject to "fiduciary responsibility" under ERISA with respect to the free funds, which were plan assets. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1143–44 (2d Cir.1992).

Hancock appealed to the Supreme Court. The Supreme Court affirmed the Second Circuit's holding, concluding:

> Hancock provided no real guarantee that benefits in any amount would be payable from the free funds. We therefore conclude, as did the Second Circuit, that the free funds are "plan assets," and that Hancock's actions in regard to their management and disposition must be judged against ERISA's fiduciary standards.

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 106, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993).[5]

In 1996, Judge Patterson recused himself. The case was reassigned to Judge Ward, then to Judge Leisure, and then to the undersigned on December 23, 1996.

The case was tried to the undersigned, without a jury, in July, August, and September 1997. The parties called numerous witnesses and submitted hundreds of exhibits as well as extensive deposition excerpts and expert reports. They thereaf-ter submitted lengthy post-trial memoranda.

## DISCUSSION and CONCLUSIONS OF LAW

### A. Applicable Legal Standards

ERISA imposes certain duties and responsibilities on plan fiduciaries, including a duty of loyalty, a duty of care, and a duty to refrain from participating in prohibited transactions. *See generally Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570–73, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985).

The duty of loyalty is set forth principally in section 404(a)(1)(A)(i), which provides that:

> a fiduciary shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries . . . .

29 U.S.C. § 1104(a)(1)(A)(i). Fiduciary duties under ERISA "must be enforced without compromise to ensure that fiduciaries exercise their discretion to serve all participants in the plan." *John Blair Communications, Inc. Profit Sharing Plan v. Telemundo Group, Inc.*, 26 F.3d 360, 367 (2d Cir.1994); *accord O'Neil v. Retirement Plan for Salaried Employees of RKO Gen., Inc.*, 37 F.3d 55, 61 (2d Cir.1994). Indeed, as Judge Friendly has noted, ERISA requires the decisions of a fiduciary to "be made with an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir.), *cert. denied*, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

---

**5.** The ERISA Clarification Act, enacted on August 20, 1996 as part of the Small Business Job Protection Act of 1996, Pub.L. No. 104–188, 110 Stat. 1755 (1996), amended § 401 of ERISA, 29 U.S.C. § 1101, to exempt "insurers who hold assets in their general account from any liability both for acts prior to its enactment and, for a defined period, for fu-ture acts that otherwise might give rise to a claim under Part 4 of ERISA." *Adkins v. John Hancock Mut. Life Ins. Co.*, 957 F.Supp. 211, 212 (M.D.Fla. Jan.21, 1997). The amendment is inapplicable to civil actions, such as the instant one, commenced before November 7, 1995. *See id.*

The duty of care is set forth in section 404(a)(1)(B), which requires a fiduciary to discharge its duties:

> with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

29 U.S.C. § 1104(a)(1)(B).

The duty to avoid prohibited transactions is covered by section 406, which prohibits a plan fiduciary from engaging in any transaction with a "party in interest," 29 U.S.C. § 1106(a)(1), or from using any plan assets for "[its] own interest or for [its] own account." 29 U.S.C. § 1106(b)(1); *see generally Pension Benefit Guar. Corp. v. Hoyte,* No. 95 Civ. 1667(JFK), 1997 WL 109439, at *3 (S.D.N.Y. Mar.11, 1997) ("Section 1106 delineates specific categories of transactions and other arrangements that violate ERISA's fiduciary responsibility rules."). Section 406:

> protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible to self-dealing. It gives notice to fiduciaries that they must either avoid the transactions described in Section 406(b) or cease serving in their capacity as fiduciaries, no matter how sincerely they may believe that such transactions will benefit the plan.

*Lowen v. Tower Asset Mgmt., Inc.,* 829 F.2d 1209, 1213 (2d Cir.1987). Indeed, as a consequence, "[g]ood faith is not a defense to violations of this provision and liability must be imposed 'even where there is no taint of scandal, no hint of self-dealing, no trace of bad faith.'" *Gray v. Briggs,* 45 F.Supp.2d 316, 326 (S.D.N.Y. 1999) (citation omitted).

■ Any fiduciary that breaches its obligations under ERISA "shall be personally liable to make good to such plan any losses to the plan resulting from such breach." 29 U.S.C. § 1109(a); *see Lockheed Corp. v. Spink,* 517 U.S. 882, 888, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996) (" § 409 of ERISA renders [plan fiduciaries] personally liable for any losses incurred by the plan, any ill-gotten profits, and other equitable and remedial relief deemed appropriate by the court"). Once an ERISA beneficiary establishes a *prima facie* case of a breach of a fiduciary duty, the burden of proof to explain or justify the fiduciary's actions shifts to the fiduciary. *See New York State Teamsters Council Health & Hosp. Fund v. Estate of DePerno,* 18 F.3d 179, 182–83 (2d Cir.1994); *see also Lowen,* 829 F.2d at 1215 ("a fiduciary charged with a violation of Section 406(b)(3) either must prove by a preponderance of the evidence that the transaction in question fell within an exemption, . . . or must prove by clear and convincing evidence that compensation it received was for services other than a transaction involving the assets of a plan") (internal citation omitted); *Marshall v. Snyder,* 572 F.2d 894, 900 (2d Cir.1978) ("the burden of proof is always on the party to the self-dealing transaction to justify its fairness").

■ Hancock argues that it cannot be found to have violated ERISA, and in particular section 404, unless the Court finds that Hancock acted in an arbitrary or capricious manner or in bad faith. (Hancock Post–Trial Br. at 50) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 114–15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Hancock is incorrect, however, as the Second Circuit has squarely rejected the argument that an ERISA fiduciary's exercise of discretion with respect to the handling of plan assets is subject to an arbitrary and capricious standard of review:

> We reject the argument that *Firestone*'s arbitrary and capricious standard applies to [the fiduciary's] conduct in this matter. *Firestone* involved the denial of benefits, and the Court stated that if the terms of the plan accorded the administrator discretion in such matters, the decision should be upheld unless arbitrary and capricious. However,

we decline to apply the arbitrary and capricious standard to the fiduciary conduct at issue here because this case does not involve a simple denial of benefits, over which the plan administrators have discretion.

*John Blair*, 26 F.3d at 369. Relying on a Third Circuit case for the proposition that courts must apply "the strict statutory standards of ERISA" to determine whether fiduciaries have "sacrificed valid interests [of beneficiaries] to advance the interests of non-beneficiaries," *id.* (quoting *Struble v. New Jersey Brewery Employees' Welfare Trust Fund*, 732 F.2d 325, 333–34 (3d Cir.1984)), the Second Circuit held:

> *Firestone*'s proposition that the more lenient arbitrary and capricious standard applies where the plan grants discretion to administrators does not alter *Struble*'s holding that decisions that improperly disregard the valid interests of beneficiaries in favor of third parties remain subject to the strict prudent person standard articulated in § 404 of ERISA.... Any other rule would allow plan administrators to grant themselves broad discretion over all matters concerning plan administration, thereby eviscerating ERISA's statutory command that fiduciary decisions be held to a strict standard.

*John Blair*, 26 F.3d at 369 (internal citations omitted). The Second Circuit held that the claim presented in *John Blair*—that the plan fiduciary ignored the interests of the members of the plaintiff plan in favor of the members of a different plan—was "properly evaluated under the strict fiduciary duties of ERISA set forth in § 404." *Id.* at 370. Here, plaintiff argues that the interests of Plan beneficiaries were ignored in favor of Hancock's own interest; such a claim is to be evaluated under the strict standards of section 404.

## B. *Application*

### 1. *Jurisdiction*

The Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. §§ 1132(e) and (f). As the Supreme Court, the Second Circuit, and this Court have all previously held, the Plan is governed by ERISA, the "free funds" are "plan assets" within the meaning of ERISA, and Hancock is, and was at all relevant times, a fiduciary under ERISA. 29 U.S.C. §§ 1002(21)(A), 1003(a); *see John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 90, 101–06, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993); *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1143–44 (2d Cir.1992); *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, No. 83 Civ. 5401(DC), 1997 WL 278116, at *1 (S.D.N.Y. May 23, 1997).

### 2. *The Merits*

I conclude that Hancock violated its obligations under ERISA by breaching its duty of loyalty and its duty to avoid prohibited transactions.

Hancock did not "discharge [its] duties ... solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i). Likewise, Hancock breached its duty to avoid prohibited transactions as it engaged in transactions with a "party in interest" and used Plan assets for "[its] own interest." 29 U.S.C. § 1106(a)(1) and (b)(1).

■ Hancock refused to return Plan assets to the Trust when the Trust sought to use the rollover procedure in 1982 to withdraw accumulated free funds. The Trust felt it could get a better return by investing the excess funds elsewhere, but Hancock refused to return the Plan assets because of its cash flow problems. Instead, Hancock exercised its discretion to terminate the rollover procedures that had enabled the Trust to withdraw a total of $12 million prior to 1982. Clearly, Hancock put its own interests and cash flow needs ahead of the interests of the Plan

and its beneficiaries. By doing so, Hancock violated its obligations under ERISA.

■ Hancock also refused to revalue the liabilities on a fair and reasonable basis. It repeatedly recognized that because of outdated interest and mortality assumptions, the liabilities of GAC 50 were grossly overstated. The overstatement of the LOF exacerbated the problem, as the Trustee could not withdraw the excess without unreasonable consequences. Hancock had the discretion to revalue the LOF but exercised its discretion in a manner that furthered its own interests and disadvantaged the interests of the Plan.

■ In addition, in making investment and allocation decisions, Hancock repeatedly placed its own interests ahead of the interests of the Plan and Plan participants and beneficiaries. Hancock invested Plan assets in its own home office properties and charged itself below-market rents. As a consequence, GAC 50 received lower investment returns. Indeed, Hancock itself recognized in 1977 that it had the "[second] largest proportion of admitted assets in Home Office properties" and the "[second] lowest rate of return on such properties," of the twelve "listed insurance companies." (PX 353). Moreover, Hancock then allocated the income to its lines of business in such a manner as to further disadvantage GAC 50.

■ Likewise, the cost of borrowing, indirect expenses, and income tax were allocated and the General Account was segmented to the disadvantage of GAC 50. Similarly, Hancock adopted a policy of imputing to common stock purchases the yields it was earning on stocks and bonds and allocated higher yielding investments to its own non-participating business and lower yielding investments to participating contracts such as GAC 50. With respect to each of these items, Hancock could have taken a different approach, but in each instance Hancock exercised its discretion to its own advantage while disadvantaging

GAC 50 and the Trust. By doing so, Hancock violated its duties under ERISA.

### 3. Hancock's Additional Defenses

### a. Guaranteed vs. Non–Guaranteed Benefits

Hancock argues that it was not a fiduciary under ERISA with respect to the guaranteed portion of GAC 50, because no discretion was involved with respect to guaranteed benefits. (Hancock Post–Trial Br. at 28–29). That may be so, but Hancock clearly was a fiduciary and had discretion with respect to "free funds." Even under Hancock's numbers, the gap between the LOF and GAC 50 assets was $22 million at year-end 1981 and $56 million at year-end 1987. (PXs 1241, 1242, 1244). The assets that the Sperry Trust withdrew in 1977, 1979, and 1981 were free funds and Sperry Trust wanted to withdraw additional free funds in 1982 but was not permitted to do so.

### b. The Contract

■ Hancock makes a multi-layered argument based on the existence of a contract. It contends that it clearly was not a fiduciary when it negotiated and entered into GAC 50, that it is not (and has not been) a fiduciary with respect to the fixed terms of the contract, and that it therefore could not have violated ERISA when it "ultimately elected to adhere to the terms of the contract and refused to alter it[ ]." (Hancock Post–Trial Br. at 35; see id. at 29–35). The problem with this argument, however, is that the existence of the contract did not relieve Hancock of its fiduciary responsibilities with respect to discretionary functions. GAC 50 gave Hancock extraordinary control—and discretion— over the investment of free funds, the allocation of investment income and expenses, and the release of excess funds. But the point is that these were discretionary matters, and Hancock was required by ERISA to exercise its discretion in accordance with its fiduciary obligations. See, e.g., IT Corp. v. Gen. Am. Life Ins. Co., 107 F.3d

1415, 1418 (9th Cir.1997) (rejecting attempt by life insurance company to exonerate itself from fiduciary responsibilities by relying upon contract), *cert. denied*, 522 U.S. 1068, 118 S.Ct. 738, 139 L.Ed.2d 675 (1998); *Leavitt v. Northwestern Bell Tel. Co.*, 921 F.2d 160, 161 (8th Cir.1990) ("Section 1110(a) prohibits agreements that diminish the statutory obligations of a fiduciary."); *Amaro v. Cont'l Can Co.*, 724 F.2d 747, 752 (9th Cir.1984) ("We do not believe Congress intended that [ERISA's] minimum standards could be eliminated by contract."). As the Seventh Circuit has held:

> When a contract … grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary.

*Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 737 (7th Cir.1986).

In making the decisions in question, Hancock clearly was exercising its discretion. Hancock permitted the Trust to remove a total of $12 million in excess funds using the rollover procedure in 1977, 1979, and 1981. It then exercised its discretion in 1982, however, to refuse to let the Trust use the procedure to remove additional funds. Likewise, although Hancock had been paying non-guaranteed benefits for some years, in 1982 it elected to terminate such payments. Again, this was a discretionary decision. Similarly, Hancock was exercising its discretion when it made investment and allocation decisions, such as deciding to invest in home office properties, charging itself below-market rents, and allocating income and expenses.[6]

Another example of Hancock's ability to exercise discretion within the parameters of the contract was the ALA. Transfers of free funds under GAC 50 were subject to the ALA, the "Asset Liquidation Adjustment." (PX 25, Art. III, § 9). GAC 50 did not set forth a formula for calculating the ALA and thus Hancock had the ability to set it. (Trapp Dep. 171–73; ASF ¶ 75). In early 1982, Hancock estimated the ALA for transfers from GAC 50 to be 39.4%; this meant that if Sperry sought a transfer of $10 million, it would receive only $6 million.

#### c. *State Law*

■ Hancock also argues that "the propriety of [its] allocation practices under state law and regulations had specifically been upheld by" Judge Patterson in his decision issued in 1991, *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 767 F.Supp. 1269 (S.D.N.Y.1991). (Hancock Post–Trial Br. at 16). But Judge Patterson never addressed the merits of the claim that Hancock breached its fiduciary duties under ERISA. Moreover, in its decision in this case, the Supreme Court specifically rejected Hancock's argument that "ERISA's fiduciary standards cannot govern an insurer's administration of general account contracts," as the Court held that while state law governing insurance generally is not displaced, "federal preemption occurs" where state law " 'stands as an obstacle to the accomplishment' " of the goals of ERISA. *John Hancock Mut. Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 97–99, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993).

#### d. *Hancock's Status as a Mutual Company*

Hancock argues that it did not violate ERISA because it is a mutual insurance company with obligations not just to the beneficiaries of GAC 50 but to all contractholders, and contends that it could not discriminate in favor of the Sperry Trust

---

**6.** At trial, Hancock's witnesses conceded that Hancock had the discretion to permit or discontinue rollover and to terminate or continue the use of free funds to pay non-guaranteed benefits. (Tr. 1352, 1354, 1682). Likewise, they conceded that in making allocation decisions, Hancock was choosing from within a range of methods—thereby exercising its discretion. (Tr. 1664–66 (Shemin: "I guess I would say yes. Hancock, the company, is exercising its discretion.")).

at the expense of its other contractholders. Hancock also argues that as a contractholder, "Sperry, in effect, owns a part of Hancock." (Hancock Post–Trial Br. at 119; *see id.* at 90, 95, 114 S.Ct. 517). These arguments are rejected.

■ Taking the arguments in reverse order: first, Sperry does not "own" a part of Hancock in any meaningful sense. *But see Indianapolis Life Ins. Co. v. United States,* 115 F.3d 430, 431 (7th Cir.1997) ("Policyholders of a mutual insurer also are nominal 'owners' of the company."). A contractholder is not a shareholder or other owner of an equity interest; it cannot "sell" its contract rights; and it has no ability to control the management of the company. (*See* Tr. 419–20; *see also* Pl. Post–Trial Br. at 113 & n. 68). The Trust's rights are limited by the contract (and as provided by ERISA). Hancock's witnesses confirmed at trial that no matter how well Hancock does financially its contractholders will never receive any "unallocated" surplus or any distribution other than that provided for in their contracts. (*See* Tr. 1533–35, 1538–39). Barry Shemin of Hancock testified that "unallocated" surplus—funds that are not allocated to any contract—is "not intended to be distributed to contract holders of any kind as a general matter." (Tr. 1663; *see also* PX 1279 at 56).

Second, the Trust is not arguing that Hancock should have discriminated in its favor to the detriment of other contractholders. Rather, it is arguing only that it should not have been treated on an inequitable basis. The Second Circuit's decision in *John Blair* is instructive in this respect.

There, the fiduciary owed "distinct duties" to two different plans. The Court held that the fiduciary "could not grant preferences as between the two." *John Blair,* 26 F.3d at 370. The Court held that where a surplus of funds was attributable to the actions of members of both plans, the fiduciary "should have apportioned the surplus between the two plans." *Id.* When the fiduciary allocated the entire surplus to one plan, it violated its fiduciary duty to the other plan. *See id.*

The point is that allocation decisions must be made by an ERISA fiduciary on a fair and reasonable basis. Allocation decisions that required participating contracts to bear investment risks while not requiring non-participating contracts to do so; that required the profitable group pension line to share the cost of loans that benefitted only other lines; and that allocated higher yielding investments to non-participating businesses and lower-yielding investments to participating contracts were not fair and reasonable.[7]

Significantly, Hancock's decisions were not driven by its concern for other contractholders or its fiduciary duties to other beneficiaries protected by ERISA. Rather, Hancock has maintained for years that ERISA did not apply and that it was not a fiduciary under ERISA. (*See* Pl. Post–Trial Br. at 14–19). Indeed, although Hancock now suggests that it was acting to protect other contractholders, its witnesses admitted at trial that it was acting to advance its own interests: the protection of its cash flow. (Tr. 1488–89, 1607–13, 1689–90; *see also* Tr. 736; PX 593).

---

7. Hancock relies on *Ganton Tech., Inc. v. National Indus. Group Pension Plan,* 76 F.3d 462, 467 (2d Cir.1996), where the Second Circuit held that plan trustees did not act "arbitrarily" in refusing to permit one employer, a participant in a multi-employer pension plan, to transfer the plan assets attributable to its employees out of the plan because of the threat that would be posed to the remaining plan participants. The facts, however, are distinguishable. Here, the Trust was not one participant in a plan, nor was the Trust seeking to withdraw all its assets out of the plan. Rather, the Trust was a contractholder representing all the beneficiaries of the Plan, and it was seeking only to withdraw a portion of *excess* funds—as it had been permitted to do on three prior occasions. In addition, Hancock acknowledged at trial that the withdrawal of the requested funds in 1982 "would not have had a major impact" on Hancock's overall financial picture. (Tr. 1689–90).

### e. *Statute of Limitations*

█ Hancock argues that the Trust's claims must be dismissed as barred by the applicable statute of limitations. The parties agree that the governing statute of limitations is section 413 of ERISA, 29 U.S.C. § 1113, which provides that no action alleging a breach by any fiduciary responsibility, duty, or obligation under ERISA may be commenced after the "earlier" of (1) six years after "the date of the last action which constituted a part of the breach" or (2) three years after the earliest date "on which the plaintiff had actual knowledge of the breach." 29 U.S.C. § 1113 (1974).[8] In other words, suit must be commenced within three years after the plaintiff acquires actual knowledge of the breach, with an outside limit of six years after the breach. *See, e.g., Carollo v. Cement & Concrete Workers Dist. Council Pension Plan,* 964 F.Supp. 677, 687–88 (E.D.N.Y.1997). In the case of fraud or concealment, however, the action must be brought no later than six years after the date of discovery of the breach. *Id.*

█ Here, although I am not persuaded that Hancock engaged in fraudulent concealment, I conclude that the six-year limitations period applies.[9] Hence, the Trust is entitled to recover its damages resulting from any breaches of ERISA occurring on or after July 20, 1977, six years prior to the commencement of this action.

█ Hancock points out that certain of the decisions in question were made prior to six years before the filing of suit. That

may be so, but Hancock was under a continuing obligation to make prudent investments and to exercise its discretion in the best interests of the Trust. Although the statute of limitations may have run with respect to certain initial investments, Hancock is still responsible for continuing violations within the six-year period. *Carollo,* 964 F.Supp. at 688 ("the six-year statute of limitations begins to run each year the fiduciaries maintain the plan in violation of their duties"); *Reich v. Glasser,* No. 95 Civ. 8288, 1996 WL 243243, at *3 (S.D.N.Y. May 10, 1996) (plaintiffs permitted to replead continuing breach theory whereby statute of limitations would run anew each time defendants made loan repayment carrying below-market interest rate); *Buccino v. Continental Assur. Co.,* 578 F.Supp. 1518, 1521 (S.D.N.Y.1983) (fiduciary's continual failure to divest itself of unlawful or imprudent investments gives rise "to a new cause of action each time the Fund was injured").

Accordingly, Hancock's statute of limitations defense is rejected, except to the extent that the Trust is seeking damages for the period prior to July 20, 1977.[10]

### 4. *Hancock's Counterclaims and Third–Party Claims*

Hancock argues that in the event the Court finds it liable to the Trust for damages in "any amount," the Court should award judgment to Hancock on its counterclaims and third-party claims against Chase, Sperry, and the SRC as co-fiduciaries to the Plan. (Hancock Post–Tr. Br. at

---

**8.** Section 413 was amended in 1987 and 1989 in respects not material to this action.

**9.** Hancock argues as to certain investments that the three-year rule should apply because the Trust had actual knowledge of certain actions taken by Hancock long before three years prior to the filing of suit. I am not persuaded, however, that the Trust had "actual knowledge" of any "breach or violation" prior to July 20, 1980. For example, Hancock did not disclose the misallocations and the Trustees could not have discovered them from the annual Financial Experience State-

ments sent to Sperry by Hancock. (Tr. at 1514–16). Neither the fact that Hancock invested Plan Assets in home office properties and subsidiaries, nor the significant "shortfall" in investment income that resulted from those investments, could be discerned from the annual Financial Experience Statements. (Tr. at 318–19; *see also id.* at 319–22, 1514–18).

**10.** Hancock also argues laches, but the Court rejected this defense in its decision on the *in limine* motions. *See* 1997 WL 278116, at *2–3.

174). *See, e.g., Chemung Canal Trust Co. v. Sovran Bank/Maryland,* 939 F.2d 12, 16 (2d Cir.1991) (defendants in ERISA breach of fiduciary duty cases may assert claims for contribution and indemnity against co-fiduciaries), *cert. denied,* 505 U.S. 1212, 112 S.Ct. 3014, 120 L.Ed.2d 887 (1992). The argument is rejected and Hancock's counterclaims and third-party claims will be dismissed.

■ Hancock was substantially more at fault than its co-fiduciaries; it therefore is not entitled to contribution. *See* Restatement (Second) Trusts, § 258 (1959). To the contrary, the SRC demanded the release of the Plan Assets, and Hancock has failed to prove that Chase, Sperry, or the SRC played any role in the actions that resulted in a breach of Hancock's fiduciary obligations. Moreover, the evidence repeatedly showed that Hancock acted in its own interest and to its own advantage.

## C. *Relief*

### 1. *Damages*

■ The proper measure of damages in this case is the difference between what the Plan actually earned and what it would have earned had Hancock not breached its fiduciary obligations. *See, e.g., Donovan v. Bierwirth,* 754 F.2d 1049, 1056 (2d Cir.1985) ("[W]e hold that the measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the Grumman investment with what the Plan would have earned had the funds been available for other Plan purposes."). The burden is on the breaching fiduciaries to prove that the funds would have earned less than the most profitable investment, and "[a]ny

doubt or ambiguity should be resolved against them." *Id.; see also Leigh v. Engle,* 727 F.2d 113, 138–39 (7th Cir.1984) ("we believe that the burden is on the defendants who are found to have breached their fiduciary duties to show which profits are attributable to their own investments apart from their control of the ... [t]rust assets. It is conceivable that the defendants who have breached can show they received no benefit at all from the use of the trust assets. In any event, while the district court may be able to make only a rough approximation, it should resolve doubts in favor of the plaintiffs.").

With respect to damages here, I accept the testimony of the Trust's witnesses and reject the contrary conclusions of Hancock's witnesses.[11]

In particular, with respect to the failure of Hancock to release excess funds, I accept Professor Ibbotson's "rollout" method of computing damages:

the damages were measured by a comparison method based on if [the] money had been rolled out and reinvested compared to the fact that it had not been rolled out and been invested at these case rates. So the damages are the difference between the returns—the money invested and its returns at reinvestment rate, which differs from the case rate.

(Tr. at 1083–84). In other words, Professor Ibbotson was of the view that if the Trust had been permitted to withdraw the excess funds, "it could have and would have invested them in the same manner that it would have invested its other money," and therefore it would have achieved a similar return. (Tr. at 1131).

---

11. Hancock's principal damages expert, Dr. Babbel, acknowledged that his calculations contained errors, errors that were not brought out until cross-examination by the Trust's counsel. (*See, e.g.,* Tr. at 1831–33 ("I think it's fair to say that there is an offsetting error [in my calculations] that is perhaps more egregious and that I didn't bring that

one up [on direct examination] either."), 1824–25, 1827–29 ("Q: So you made a number of what I guess might be called fundamental errors with respect to how you were looking at these issues, isn't that correct? A: I omitted those charges. I'm sorry."), 1833–34).

I find that Professor Ibbotson's use of the actual overall Sperry Trust rate of return is fair and reasonable in determining what the Trust would have earned had the excess funds been returned by Hancock. (*See* Tr. at 1129). The excess funds should have been released to the Trust, they would have had been available for the Trust to invest, and it is fair and reasonable to assume that they would have earned a rate equal to the Trust's actual overall rate of return. (Tr. at 1131). The damages in this respect, as of October 31, 1988 (when Hancock paid out the excess), are $13,767,200. (PX 1257; Tr. at 1131–32). I will also award the Plan pre-judgment interest on that amount, based on the Sperry Trust overall rate of return, from October 31, 1988 to the date of judgment. (*See* Tr. at 1162–63; PX 1266). *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 286 (2d Cir.1992). Interest will be compounded. (Tr. at 1163, 1164; PX 1266). *See Russo v. Unger*, 845 F.Supp. 124, 127–28 (S.D.N.Y.1994).[12]

As for the allocation and excess risk charge claims, I accept the testimony of the Trust's witnesses, including Mr. McCarthy (*see, e.g.*, Tr. 221, 345–48, 350–51, 367–69), and I reject the contrary testimony of Hancock's witnesses. Damages in these respects will be awarded for the period after July 20, 1977, and they will be adjusted to avoid a double recovery because I have accepted Professor Ibbotson's damages analysis as to excess funds. In addition, I will not award damages for "other scaling." Accordingly, I will award the Trust additional damages in the amount of $5,724,528, as of December 31, 1996 based on the Moreen "true excess." (*See* PX 1237). This number must be adjusted for additional interest from January 1, 1997 to date.

### 2. *Equitable Relief*

The Trust seeks equitable relief in the form of an accounting and removal of Hancock as a fiduciary for the Plan.

The request for an accounting is denied. A court may decline to order an accounting when a party has an adequate remedy at law. *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir.1985). Here, the Trust had full access to Hancock's records during discovery, the financial data has been studied by experts, and the litigation has been pending for years. In addition, I am awarding substantial damages. Under these circumstances, the Trust has an adequate remedy at law and I will not order an accounting now.

I will order the removal of Hancock as a fiduciary for the Plan. ERISA provides that:

> Any person who is a fiduciary with respect to a [covered] plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be ... subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a); *see Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir.) (fiduciaries may be removed for "repeated or substantial violation[s] of [their] responsibilities") (quoting *Marshall v. Snyder*, 572 F.2d 894, 901 (2d Cir.1978)), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). As I have found, Hancock engaged in repeated and substantial violations of its fiduciary responsibilities under ERISA. The Trust's desire to terminate the relationship is understandable. Accordingly, removal is appropriate.

### 3. *Attorneys' Fees and Costs*

The Trust will be awarded its reasonable attorneys' fees and costs incurred in bringing this action, pursuant to section 502(g) of ERISA. 29 U.S.C. § 1132(g).

---

12. The prejudgment interest calculation offered at trial was a multiplier of 2.6657, which was as of June 30, 1997. (PX 1266). The calculation will have to be revised to bring the interest calculation up to date.

*See, e.g., Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 602 n. 8 (2d Cir.1983); *Birmingham v. SoGen–Swiss Int'l Corp. Retirement Plan,* 718 F.2d 515, 523 (2d Cir. 1983). Hancock has breached its duties as a fiduciary and has instead acted for its own self-interest. It has the ability to satisfy an attorneys' fee award. The award is necessary to deter Hancock and other fiduciaries from engaging in similar conduct in the future. The lawsuit has conferred a significant benefit on the Plan and its participants. An assessment of the relative merits of the parties' positions also weighs in favor of an award of fees. In addition, an award of attorneys' fees is particularly appropriate in this case because Hancock charged a portion of its litigation costs in *this* case to GAC 50. (*See* Tr. at 1397; *see also* Tr. at 1567–68).

On or before December 6, 2000, the Trust shall submit an application for attorneys' fees and costs, in the nature of a lodestar computation, *i.e.,* providing brief descriptions of work performed and reporting the hours billed and hourly rates charged per attorney. The application shall include brief explanations of the billing rates. The Trust shall also include a schedule of costs for which it requests reimbursement.

### CONCLUSION

The Trust shall submit a proposed judgment on or before December 6, 2000. The Trust will submit, at the same time, an affidavit explaining the interest calculations as well as its application for attorneys' fees and costs. Hancock shall submit any objections to the proposed judgment within seven business days after receipt of the Trust's papers.

SO ORDERED.