John H. JOHNSON, et al.,
Plaintiffs–Appellants,

v.

GEORGIA–PACIFIC CORPORATION,
et al., Defendants–Appellees.

No. 93–2357.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1993.

Decided March 23, 1994.

John F. Maloney, McNALLY, MALONEY & PETERSON, Milwaukee, WI, Susan Martin (argued), WARD, KEENAN & BARRETT, Phoenix, AZ, for plaintiffs-appellants.

Michael H. Auen (argued), FOLEY & LARDNER, Madison, WI, Karl A. Dahlen, Paul D. Braun, FOLEY & LARDNER, Milwaukee, WI, for defendants-appellees.

Before EASTERBROOK and ROVNER, Circuit Judges, and REINHARD, District Judge.*

EASTERBROOK, Circuit Judge.

Great Northern Nekoosa Corporation (GNN) decided to resist a takeover bid by Georgia–Pacific Corporation. Among the steps GNN took to make itself less attractive was an alteration in its pension plan. At the end of 1989 the plan's assets exceeded the value of all promised benefits (including those that had not vested) by some $80 million. Because employees had made contributions toward their pensions until 1988, the Employee Retirement Income Security Act (ERISA) prevented GNN from withdrawing the full surplus by terminating the plan and purchasing annuities to pay vested benefits. 29 U.S.C. §§ 1103(c), (d), 1344(d)(3)(A). Cf. *Mead Corp. v. Tilley,* 490 U.S. 714, 109 S.Ct. 2156, 104 L.Ed.2d 796 (1989). Nonetheless, the surplus was of substantial benefit to the firm and its current employees. After 1987 all employee contributions ceased, increasing the workers' take-home pay.[†] GNN itself had not chipped into the fund for many years, exercising a privilege to suspend contributions that it had reserved in § 11.1 of the plan's governing document. If the surplus were exhausted, the firm or its employees, or both, would have to start contributing again.

GNN took advantage of this fact by amending the plan. An amendment adopted by GNN's board in November 1989 (and approved by the employees' union) provided that a change of control would cause an increase in benefits to current employees sufficient to exhaust the surplus; moreover, all pension benefits would vest whether or not the employees met the applicable time-of-service requirements. The upshots: (a) if Georgia–Pacific won control, it would have to make contributions to the pension plan, while if control did not change GNN would not need to make contributions for the foreseeable future; (b) GNN's employees would feel more free to quit if Georgia–Pacific won (for leaving would not diminish their newly vest-

---

* Hon. Philip G. Reinhard, of the Northern District of Illinois, sitting by designation.

† Employees contributed 2% of the first $4,800 of their compensation and 4% of the next $13,200, a limit of $624 per year. This is the maximum increase in effective pay attributable to the end of contributions in 1988; how much of this actually reached the employees' paychecks depended on their tax situations. Nekoosa made contributions on salary exceeding $18,000 per year, up to the amount needed to ensure the trust's solvency. According to the complaint, "most" of the $80 million surplus in the plan was attributable to employee contributions.

ed benefits) than if GNN retained control, and an exodus of skilled employees might make the firm less productive in Georgia–Pacific's hands.

Defensive tactics such as this often injure shareholders, depriving them of the premium the bidder offers for their stock. See *Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496, 500–02 (7th Cir.1989) (collecting data). As things turned out, Georgia–Pacific obtained control in March 1990. Current workers' benefits were increased by a factor of 1.789766 and immediately vested in full; the plan is no longer overfunded. Although the alteration of the pension plan may have reduced the price Georgia–Pacific paid for GNN's stock, GNN's former shareholders were sufficiently satisfied that they did not file suit against its managers. This suit was commenced by GNN's pensioners. The retirees contend that they are entitled to the same benefits increase as the current workers; after all, they submit, it was their contributions that produced the surplus. By increasing current employees' promised pension benefits without increasing the retirees' pensions, plaintiffs say, GNN and its successor Georgia–Pacific violated not only the terms of the pension trust but also the fiduciary standards established by ERISA. The district court dismissed the case on the pleadings, see Fed. R.Civ.P. 12(b)(6), ruling that both ERISA and the plan's governing documents permit an employer to increase the pension benefits promised to current workers without increasing payments to retirees. Because retirees receive no more than their contract promises, see *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir.1993) (en banc), and the promised pensions have not been reduced, see 29 U.S.C. § 1054(g), the district court concluded that there was no point in developing the facts in detail.

Because the district court dismissed the case on the pleadings, we assume that GNN's managers were up to no good—that they amended the pension plan to serve their own interests rather than those of investors or employees, past, present, or future. Managerial self-protection is not the only way to understand what happened. Changes of control bring uncertainty. The new owner may close plants or change the composition of the labor force. An increase in pensions (a form of deferred compensation)—and particularly immediate vesting, which protects against the loss of anticipated benefits—is a form of compensation for the uncertainty that attends a change of control. Pensioners could not complain if GNN or Georgia–Pacific promised current workers a deferred bonus or increased their salaries to make them indifferent between secure employment with GNN and risky employment with Georgia–Pacific. Uncertainty in the wake of a takeover affects only the current employees. What this suit depends on is a cry of: "Not with our money, you don't!" Yet the retirees do not own the assets of a defined-benefit pension plan. Their contributions purchased not a pool of assets (as would be the case with a defined-contribution plan) but a promise of benefits. 29 U.S.C. § 1002(34). Employees who contribute to a defined-benefit plan are in this respect like persons who purchase annuity contracts from insurance companies. They obtain a guaranteed stream of payments; the insurer (or, with pension plans, the employer) bears the investment risk. See Stephen R. Bruce, *Pension Claims: Rights and Obligations* 14–15 (2d ed. 1993); Daniel R. Fischel & John H. Langbein, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule*, 55 U.Chi.L.Rev. 1105, 1112–13, 1138–43 (1988). From this perspective an increase in the pension benefits promised to current employees is not fundamentally different from a bonus paid directly to the workers (although it has different tax consequences and affects savings differently): the employer bears the full cost over the long run, whether by paying in cash today or by undertaking to make future contributions to keep the plan solvent. For the purpose of this litigation, however, we assume that GNN lacked a sound reason to increase current workers' benefits while leaving retirees' benefits alone. We ask only whether GNN had the power to make such a decision.

According to the retirees, providing more for active workers without adding benefits for retirees offends § 9.5 of the pension plan, which provides:

Any discretionary acts to be taken under the provisions of the Plan by the Board of Directors, the Board of Directors Committee, or by the Committee, with respect to classification of Employees, contributions, or benefits shall be uniform in their nature and applicable to all those persons similarly situated, and no discretionary act shall be taken which shall be discriminatory under the provisions of the Internal Revenue Code as it now exists or may from time to time be amended.

It is a nice question whether active and retired workers are "similarly situated" for this purpose. An increase in average wages would lead to higher pensions for current workers without any alterations in the plan's formulas for computing benefits, yet it is hard to believe that this common effect is forbidden. But determining which employees are situated "similarly" to which others would be a bootless exercise in view of this excerpt from § 11.1 of the plan:

The Company ... reserves the right at any time and from time to time by action of its Board of Directors to modify or amend in whole or in part any or all of the provisions of this Plan, but no such action shall reduce or deprive any person of benefits credited to the date of modification or amendment....

No part of the assets of the Plan shall, by reason of any modification or amendment, be used for, or diverted to, purposes other than for the exclusive benefit of Members or their beneficiaries under the Plan and for administrative expenses of the Plan prior to the satisfaction of all liabilities to Members and their beneficiaries for retirement benefits based upon Creditable Service theretofore rendered.

So the trust instrument contains a broad amending power, subject to two limitations: GNN may not reduce benefits already credited to any employee, and it may not withdraw assets without first satisfying all liabilities for benefits. This language, drafted in 1948, anticipated the no-reduction, exclusive-benefit, and asset-withdrawal limitations that were to be codified when Congress enacted ERISA in 1974. See 29 U.S.C. §§ 1054(g), 1103(c), (d), 1344(d)(3)(A).

When amending the plan in November 1989, GNN made it clear that it was using the power under § 11.1 to alter every provision that it was necessary to change. The amendment begins:

The Plan is hereby amended by adding new sections 9.7 and 9.8 as follows:

9.7 *Effect of Change of Control.* Anything in the Plan to the contrary notwithstanding ...

Thus if, as the retirees contend, § 9.5 entitled them to benefit increases in lockstep with improvements for active workers, this profits them nothing—for then § 9.5 is just something "to the contrary" of the new clauses and has been overridden. When the amendment took effect, the uniformity clause of § 9.5 passed out of existence to the extent it was "contrary" to the two added sections. And the amendment did not transgress the limitations in § 11.1 itself: it did not reduce anyone's pension, and it did not withdraw any assets from the plan. Cf. *Chait v. Bernstein,* 835 F.2d 1017, 1023 (3d Cir.1987). The district court was entitled to grant the motion to dismiss without affording plaintiffs an opportunity to delve beneath the surface of the 1989 amendments. It may be, as they say, that the minutes of GNN's board do not reflect any consideration of § 9.5 and the amending power in § 11.1, but the text is not ambiguous. Omissions from the "legislative history" of a pension or welfare plan may not be used to undermine or vary the terms of that plan. *Bidlack,* 993 F.2d at 607–08 (lead opinion), 616–19 (dissenting opinion) (these two opinions speak for a majority of the court and establish that extrinsic evidence may not be used to create an ambiguity).

A transaction of this kind could reduce the *expected* value of the benefits. Writing additional promises without increasing the assets available to fund those promises increases the risk that at some time in the future—if, perhaps, the economy takes a downturn and Georgia–Pacific is unable to top up the plan—the trust will be unable to satisfy all of its obligations. Plaintiffs' complaint does not pursue such a theory, however, and at oral argument plaintiffs' counsel declined an invitation to argue that the transaction increases the risk of non-payment.

■ In an effort to block the use of § 11.1, the retirees contend that such an amendment to the plan violates GNN's fiduciary duties under ERISA.

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Many of the defendants serve as fiduciaries under this definition, because they exercise discretion concerning the management or administration of the plan. Note, however, that this definition does not make a person who is a fiduciary for one purpose a fiduciary for every purpose. A person "is a fiduciary to the extent that" he performs one of the described duties; people may be fiduciaries when they do certain things but be entitled to act in their own interests when they do others. *John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank*, —— U.S. ——, —— ——, 114 S.Ct. 517, 523–25, 126 L.Ed.2d 524 (1993).

■ One subject conspicuously missing from § 1002(21)(A) is the establishment and amendment of the plan itself. Employers decide who receives pension benefits and in what amounts, select levels of funding, adjust myriad other details of pension plans, and may decide to terminate the plan altogether. In doing these things, we have held, they are no more the employees' "fiduciaries" than when they decide what wages to offer or whether to close the plant and lay the workers off. E.g., *McGath v. Auto–Body North Shore, Inc.*, 7 F.3d 665, 670–71 (7th Cir.1993); *Joseph Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994, 1001–02 (7th Cir.1993); *Young v. Standard Oil (Indiana)*, 849 F.2d 1039, 1044–45 (7th Cir.1988); *United Independent Flight Offi-*

*cers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1268–69 (7th Cir.1985). And no wonder. Defined-benefit plans create claims not just against the assets in the pension trust but against the employer's general assets. Excessive promises of benefits, or poor performance by the assets held in trust, oblige the employer to pay additional sums. As the entity with ultimate responsibility for satisfying the pension promises, the employer is entitled to control decisions about the level of benefits to be guaranteed and the means by which that is accomplished. When making the amendments, GNN dealt with the plan as settlor, not as trustee. Accordingly, when amending the plan in November 1989 the defendants did not act as fiduciaries under ERISA.

What about the implementation of the amendment in March 1990? Section 1002(21)(A)(i) says that any person who "exercises any authority or control respecting management or disposition of [a plan's] assets" acts as a fiduciary. According to the plaintiffs, when Georgia–Pacific acquired control GNN used or disposed of the $80 million surplus to provide additional benefits to the active workers. They point to this language in the new § 9.7:

[U]pon and following a Change of Control ... (b) the assets of the Plan as of the date of the Change of Control in excess of the Plan's benefit liabilities as defined in Section 4001(a)(16) [of ERISA] shall be used to increase the accrued benefit of Active Members in the Plan who are employees in the Company in proportion to the present value of their accrued benefit....

Although this passage says that the surplus assets will be "used" to increase the active workers' benefits, the plaintiffs submit that "use" and "disposition" are synonyms, which triggers fiduciary duties under ERISA.

■ Like many words in English, "use" is a chameleon drawing color from its surroundings. See *Smith v. United States*, —— U.S. ——, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (one may "use" a firearm in a drug transaction by selling it as well as by shooting it); cf. *Deal v. United States*, —— U.S. ——, ——, 113 S.Ct. 1993, 1996, 124 L.Ed.2d 44 (1993). In some contexts "use" and "dis-

pose of" could be synonyms—but not in this one. The "management or disposition" language in ERISA refers to the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on. Fiduciaries must deal with the assets of the trust as a prudent person would, a charge that includes diversification and the application of reasonable skill. 29 U.S.C. § 1104(a). Fiduciaries also may not exchange assets between the trust and the employer sponsoring the plan and may not deal with the plan for their own accounts. 29 U.S.C. § 1106(a), (b). Cf. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110–11, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) (remarking on other parallels between ERISA and the private law of trusts). None of the events in March 1990 transferred, sold, exchanged, or otherwise affected any asset of the plan.

■ Consider what the "surplus" of a defined-benefit plan is. It is not a pile of assets stacked in the corner. It is instead an accounting construct. The plan determines the value of its assets—stocks, bonds, real property, cash, and so on. It also estimates the cost of fulfilling all of the promises to pay vested benefits. The former computation yields the asset side of the balance sheet, the latter computation the liability side. The difference between these is the "surplus" or "deficit" (depending on whether the number is positive or negative), which appears on the debit side of the balance sheet to make the two columns tally. Section 1002(21)(A)(i), in conjunction with §§ 1104 and 1106, requires trustees and other persons to deal with the assets of the plan in circumspect and prudent ways. It has nothing at all to say about the debit column on the balance sheet—yet the amendments GNN made to the plan affected *only* the plan's liabilities. The surplus assets were "used" only in the sense that the trustees of the fund performed a calculation that revealed how much the pension promises to active employees could be increased without making the plan underfunded. The trustees performed the calculation and increased the promises by exactly that amount. The plan's liabilities increased; the assets were unaffected; the surplus disappeared. Quite unlike the situation in *Donovan v. Bierwirth*,

680 F.2d 263 (2d Cir.1982), where the pension trust bought stock in the market in an effort to ward off a takeover, and *Leigh v. Engle*, 727 F.2d 113 (7th Cir.1984), where the trust's assets were used to acquire stock in potential acquisition targets, none of GNN's acts can plausibly be described as the "management or disposition of [a plan's] assets" within the meaning of ERISA.

■ Much of the retirees' contrary argument supposes that they "owned" the surplus, and that GNN gave away "their assets" to the current workers. We have already explained the fallacy of this perspective. A defined-benefit plan gives current and former employees property interests in their pension benefits but not in the assets held by the trust. *Hickerson v. Velsicol Chemical Corp.*, 778 F.2d 365, 374 (7th Cir.1985). If the investments appreciate, the plan need not devote that increase to improving benefits; it may retain the surplus as a cushion against the day when yields decrease, or the employer may cease making contributions and allow the surplus to erode as liabilities continue to increase. Many ordinary economic events alter the distribution between active and retired employees without any conceivable claim that the employer has violated its fiduciary duties. Today's employees earn higher wages than yesterday's, which means that the standard formula in a defined-benefit plan (setting the pension at some percentage of the terminal wage, multiplied by the number of years of credited service) favors current over former workers, and favors workers close to retirement over those new to the work force. See Fischel & Langbein, 55 U.Chi.L.Rev. at 1119–22. Changes in the tax laws may favor deferred consumption; any increase in the marginal rate of taxation, coupled with the fact that pension trusts do not pay taxes on their earnings, has this effect. Current workers therefore may prefer (and employers may offer) a package containing less current income and more pension wealth. It may be necessary to alter the plan's formulas to bring this about, but the retirees—who continue to receive what they bargained for—have no legitimate complaint about such alterations. *Fletcher v. Kroger Co.*, 942 F.2d 1137, 1139–40 (7th Cir.

1991). Pensions are deferred compensation; just as the employer may raise the wages of current employees without owing anything to retirees, so it may raise the pensions of current employees without owing anything to persons who found satisfactory the combination of current and deferred pay offered during their years of service. See *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91, 103 S.Ct. 2890, 2896–97, 77 L.Ed.2d 490 (1983); cf. *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) (unions are entitled to favor active over retired employees when negotiating for changes in pension benefits). So, too, when a plan is overfunded, and the employer elects to leave benefit levels alone and to cease making contributions, the employer may distribute the money it saves. Whether it does so to the investors or to the current workers, the retirees have no complaint.

Pension law covers bad times as well as good times. In bad times (when declines in the value of assets make plans underfunded) employers must contribute more. If in good times employers were required to distribute the surplus to retirees on the theory that they "owned" that value, outcomes would be asymmetric. Employers would be liable for shortfalls but could reap no benefit from surpluses. Rational employers would respond to that structure by reducing the levels of benefits promised in plans (or by creating fewer plans). Neither effect would serve employees' long run interests; neither would be consistent with the purposes underlying ERISA. At all events, because ERISA is a highly technical statute our part is to apply it as precisely as we can, rather than to make adjustments according to a sense of equities in a particular case. *John Hancock*, —— U.S. at ——, 114 S.Ct. at 531; *Mertens v. Hewitt Associates*, —— U.S. ——, ——, ——, 113 S.Ct. 2063, 2066, 2072, 124 L.Ed.2d 161 (1993). GNN did not exceed its powers under the statute Congress enacted.

AFFIRMED.