18

HARRIS TRUST AND SAVINGS BANK,
as former Trustee of the Sperry Master Retirement Trust No. 2 (and its
successor, the Unisys Master Trust)
and The Bank of New York, as Trustee of the Unisys Master Trust, Plaintiffs–Appellees,

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant–
Third–Party Plaintiff–Appellant,

v.

Sperry Corporation and The Retirement
Committee of Sperry Corporation,
Third–Party Defendants–Appellants,

Chase Manhattan Bank, N.A.,
Counterclaim Defendant–
Appellee.

Docket No. 01–7608.

United States Court of Appeals,
Second Circuit.

Argued: April 29, 2002.

Decided: Aug. 20, 2002.

Edwin G. Schallert, Debevoise & Plimpton, New York, N.Y. (Donald W. Hawthorne, Frances L. Kellner, Christopher J. Klatell, Debevoise & Plimpton, New York, NY, Howard G. Kristol, Robert M. Peak, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York, NY, of counsel), for Defendants–Appellants.

Lawrence Kill, Anderson Kill & Olick, P.C., New York, N.Y. (John B. Berringer, Ann V. Kramer, Anderson Kill & Olick, P.C., New York, NY, Brian C. Lucas, Unisys Pension Plan, of counsel), for Plaintiffs–Appellees.

Before: MINER and SACK, Circuit Judges, and BERMAN, District Judge.[*]

MINER, Circuit Judge.

Defendant-appellant John Hancock Mutual Life Insurance Company ("Hancock") appeals from a judgment entered in the United States District Court for the Southern District of New York (Chin, *J.*), awarding to plaintiffs-appellees Harris Trust and Savings Bank and The Bank of New York ("Harris") $84.88 million, including attorneys' fees and interest, the court having found that Hancock violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, by breaching in various ways its fiduciary duties of loyalty and avoidance of self-dealing.

In 1941, Hancock and Sperry Rand Corporation ("Sperry"), one of Harris' predecessors as trustee,[1] entered into Group Annuity Contract No. 50 ("the Contract"), which established a retirement plan for the benefit of Sperry's employees ("the Plan"). As originally conceived, the Contract was a deferred annuities form of contract whereby Sperry purchased from Hancock deferred annuities to be paid to Sperry employees upon retirement. The premiums paid by Sperry for the annuities became part of Hancock's General Ac-

---

1. Sperry was succeeded by Chase Manhattan Bank and then by Harris as trustee of the retirement plan. "Sperry" will be used throughout this opinion to refer to the entity that was serving as trustee on the occasions described.

count, and Hancock issued the guaranteed annuities at purchase rates fixed by the Contract. By a 1968 amendment, the Contract was modified to make it a Retrospective Intermediate Participation Guarantee form of contract. This meant that the premiums paid in by Sperry were credited to a "Pension Administrative Fund," which is an account maintained for Sperry on Hancock's books. As had been the case prior to the amendment, the premiums paid went into Hancock's General Account, from which Hancock made investments on behalf of many different clients, and from which every year it allocated investment income and expenses to the Plan. The parties agreed that Hancock would hold in reserve 105% of the liabilities of the guaranteed annuities portion of the Plan; the amount in excess of that reserve is referred to as "free funds." The 1968 amendment also provided a mechanism whereby Sperry could withdraw, or "roll over," free funds through a lump-sum transfer of free funds. Exercise of this provision would trigger the reversion of the Contract to a deferred annuity contract as it was prior to the 1968 amendment.

Due to the high interest rates of the late 1970s and early 1980s, the value of the Plan increased significantly, and Sperry sought to remove free funds without suffering the paper losses that would have resulted if Sperry withdrew free funds in accordance with the terms of the Contract. On three occasions, Hancock permitted Sperry to roll over free funds in a manner that would not result in these paper losses but, citing cash flow problems, Hancock refused Sperry's fourth request.

In the early 1980s, Sperry also requested at various points that Hancock alter the method by which it valued the liabilities for the guaranteed portion of the Plan's assets because the interest rate assumptions provided by the Contract caused the Plan's liabilities to be significantly overstated. Hancock refused this request as well.

Frustrated but unwilling to terminate the Contract, Sperry sued Hancock in 1983, alleging breach of contract, unjust enrichment, professional malpractice, and breach of fiduciary duty and other violations of ERISA. Following years of appeals, a bench trial eventually took place in the Southern District of New York and was concluded on November 22, 2000. The district court found that Hancock had breached its fiduciary duties under ERISA and awarded Sperry $84.88 million in damages, attorneys' fees, and interest.

For the reasons that follow, we affirm in part, reverse in part, and vacate in part and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

### I. *Factual History*

The factual background of this litigation, which is now in its nineteenth year, is set forth in the numerous opinions issued prior to the present appeal. The most detailed factual summaries are contained in the decision of the district court from which this appeal was taken, *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 122 F.Supp.2d 444 (S.D.N.Y.2000) ("*Judgment Opinion* "), and the decision by this Court when the case was last before us, *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138 (2d Cir.1992) ("*Second Circuit* "), *aff'd sub nom. John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) ("*Supreme Court* "). Familiarity with those decisions is assumed and only the facts necessary to the disposition of this appeal are recounted here.

### A. *The Contract*

The Contract to which Sperry and Hancock were parties, entered into in 1941, was a deferred annuities form of contract under which Sperry purchased from Hancock deferred annuities to be paid to Sperry employees upon retirement. *Second Circuit,* 970 F.2d at 1141. In 1968, the Contract was amended to provide that the money paid in by Sperry was credited to the Plan, which was part of Hancock's General Account. *Id.* From this account, Hancock made investments on behalf of many different clients, and every year it allocated investment income and expenses to the Plan. *Id.*

In addition to what was effectively an investment management service, Hancock provided several other benefits under the Contract. First, Hancock guaranteed that Sperry's beneficiaries would receive upon retirement a certain fixed annuity regardless of the performance of the Plan. *Id.* The post–1968 Contract thus preserved its essential pre–1968 feature.

Second, Hancock provided Sperry access, with certain restrictions, to the free funds generated by its payments into the General Account. The free funds were calculated as follows. Every year Hancock calculated its forecasted Liabilities of the Fund ("LOF"). *Id.* Under the Contract, the Plan had to be maintained at a Minimum Operating Level ("MOL"), which was 105% of the LOF. *Id.* Free funds constituted any amount in the Plan in excess of the MOL.[2]

At all times under the post–1968 Contract, Sperry had the option of ordering a return of free funds, at which point the Contract would revert to a deferred annuity contract (*i.e.,* the way it was before 1968). In accordance with state law, Hancock had to account for the Plan, the LOF, and the free funds using the book value of assets. However, the Contract provided that free funds be returned only at market value, which would require a "mark-to-market" calculation. In an environment of rising interest rates, the mark-to-market adjustment generally would have reduced the value assigned to the funds released, as the high interest rates would have caused the market value of bonds and some other assets in Hancock's General Account to fall below their book value. *Judgment Opinion,* 122 F.Supp.2d at 450.

A contractual benefit for Sperry created by the 1968 amendments was a provision allowing Sperry to designate additional employees, beyond those whose annuities Hancock had originally guaranteed, to receive benefits from the Plan. *Second Circuit,* 970 F.2d at 1142. So long as the Plan amount was sufficient to cover the corresponding increase in the LOF and thus the MOL, Hancock would add these employees to the guaranteed beneficiaries list. *Id.* However, in 1977, the parties amended the Contract to provide that, while Sperry could continue to designate new employees to receive benefits from the free funds, these benefits would no longer be guaranteed in case of a reversion to a deferred annuity contract. *Id.* at 1142. In addition, Hancock reserved the right to stop accepting such new non-guaranteed employees upon notice, an option it exercised in 1982. *Id.* Sperry could always *buy* new

---

**2.** If the Plan had fallen below the MOL as a result of overall poor performance of Hancock's General Account, a contractual triggering event would have occurred, and the Contract would have reverted to a basic deferred annuity contract. Hancock would then have been responsible for funding those employee annuities, either directly out of other sources in its General Account, or by purchasing annuities for Sperry employees on the open market. *Id.* at 1141–42. As it turned out, this triggering event never occurred.

guaranteed benefits, although it never did so.

At several points Hancock consented to a benefit not specified in the Contract by allowing Sperry to withdraw free funds at their book value, *i.e.*, without applying the mark-to-market adjustment. These roll-overs occurred in 1977, 1979, and 1981. *Judgment Opinion*, 122 F.Supp.2d at 451. However, Sperry's fourth request for a rollover, in 1982, was rejected by Hancock. *Id.*

Prior to 1981 Sperry had been requesting that Hancock consider changing the way it valued the LOF because higher interest rates had caused the liabilities to be greatly overstated. *Id.* at 452–53. Internal memoranda demonstrate that Hancock recognized that the LOF was overstated. Nonetheless, Hancock declined to alter the method for calculating the LOF, stating that its policy was to value annuities according to the method initially established by contract. *Id.* at 452.

In December 1981, Hancock presented to Sperry possible changes to the Contract, including a revised method for calculating the LOF that would take account of the higher interest rates. *Id.* at 453. The parties subsequently discussed additional revaluation proposals, which were ultimately rejected by Sperry. Therefore, no changes were made to the Contract regarding the interest rate assumptions used for calculating the LOF.

As compensation for administration of the Plan, Hancock received under the Contract an annual "risk charge" equal to 1% of the net interest earned by the Plan. *Id.* at 450.

### B. *Hancock's Investment and Allocation Decisions*

### 1. *Fixed and Frozen Assets*

From at least as early as 1976, Hancock invested assets of the Plan in its own home office properties and charged itself rent, thereby generating investment income. *Id.* at 453. Hancock invested a greater proportion of its assets in home office properties than most other comparable insurance companies. *Id.* at 454. The rates of return were consistently lower in many years than the return on other investments made by Hancock for its customers, due, in part, to the fact that Hancock was charging itself below-market rent on its properties. Also, two of the buildings in question had low occupancy rates but high operating expenses. *Id.*

Hancock allocated the investment income for these "fixed and frozen assets" in a manner that was advantageous to its group insurance line of business and disadvantageous to the group pension line, which includes the Plan. Hancock did not allocate any portion of its investments in fixed and frozen assets to the portion of the General Account for which Hancock bore the investment risk. *Id.* Hancock's group pension actuary and others at Hancock repeatedly questioned the manner in which Hancock was allocating fixed and frozen income to the group pension line. Nonetheless, Hancock did not significantly alter the way in which it allocated its investments in fixed and frozen assets. *Id.* at 455.

Hancock also invested in its own subsidiaries, which similarly yielded low rates of return. These investments were allocated in the same manner as the investments in other fixed and frozen assets. *Id.*

### 2. *The Cost of Borrowing*

During certain years Hancock borrowed money and allocated the cost of that borrowing to different lines of business, including the group pension line, which included the Plan. *Id.* The group pension line of business, however, was always profit-

able and the cash flow associated with the Plan was always positive. Hancock nonetheless allocated borrowing costs to the Plan. *Id.* at 455.

### 3. *Indirect Expenses*

Hancock also allocated to the Plan a portion of the litigation costs of the instant case and a portion of the expenses incurred in lobbying Congress to amend ERISA to relieve Hancock and other insurers of the fiduciary duties that the courts in this case have held ERISA imposes on them. *Id.* at 456.

### 4. *Segmentation*

In 1982, Hancock divided its General Account into subaccounts that had their own investment policies. *Id.* One of these subaccounts was the participating segment, which was applicable to the Plan, and another was the non-participating segment. For the 1982 investment year, Hancock allocated higher yielding investments to its non-participating business than it allocated to participating contracts. *Id.* Thus, Hancock benefitted from this allocation, to the detriment of the participating segment, which included the Plan.

### II. *Procedural History*

Sperry first pleaded its claims against Hancock in a complaint dated July 20, 1983. In its ruling on the parties' motions for partial summary judgment dated September 26, 1989, the district court (Patterson, *J.*) dismissed Sperry's claims under ERISA, holding that the Plan qualified as a "guaranteed benefit policy" and was therefore exempt from ERISA's fiduciary responsibilities. *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 722 F.Supp. 998, 1019–20 (S.D.N.Y.1989). On August 6, 1991, the district court (Patterson, *J.*) granted Hancock's motion for summary judgment on the contract and common law claims. *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 767 F.Supp. 1269, 1284 (S.D.N.Y.1991). The district court's final judgment, entered on August 16, 1991, dismissed in its entirety Sperry's complaint as amended.

Sperry appealed that judgment to this Court. We agreed with the district court that the guaranteed portion of the Plan was exempt from ERISA's fiduciary duties, but reversed the court's determination that Hancock had no fiduciary duty with regard to the free funds, which constitute the non-guaranteed portion of the Plan. *Second Circuit,* 970 F.2d at 1148. Sperry then successfully petitioned the Supreme Court for a writ of certiorari, and that Court affirmed our ruling, holding that ERISA's guaranteed benefit policy exclusion did not apply to the free funds. *Supreme Court,* 510 U.S. at 90, 114 S.Ct. 517.

Following a bench trial, the district court (Chin, *J.*) determined that Hancock had violated ERISA by breaching its fiduciary duties of loyalty and avoidance of self-dealing when it: (1) refused Sperry's 1982 request to roll over free funds; (2) refused to revalue the LOF; (3) collected the 1% risk charge for administration of the Plan; and (4) made investment and allocation decisions that placed its own interests ahead of the interests of the Plan and Plan participants and beneficiaries. *Judgment Opinion,* 122 F.Supp.2d at 459–60.

In the damages phase of the trial, the district court held that Sperry was entitled to the following: (1) $13,767,200 in damages for Hancock's failure to release the free funds, and $42,431,262 in prejudgment interest on that amount; (2) $5,696,400 in damages with respect to the allocation and excess risk charge claims, and $4,051,849 in prejudgment interest on that amount; (3) $6,012,726.68 for attorneys' fees and

costs, and $12,921,022.54 in prejudgment interest on that amount; and (4) $1,080 for costs for expert witnesses. *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 137 F.Supp.2d 351, 355–60 (S.D.N.Y.2001).

This timely appeal followed.

## DISCUSSION

■■■ We review the district court's findings of fact for clear error, *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 148 (2d Cir.1999), and its conclusions of law *de novo*, *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir.2001). Further, we review the district court's decision to award attorneys' fees for abuse of discretion, *Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 379 (2d Cir.2002) and its calculation of those damages as a matter of law, *de novo*, *id.*

### I. *The Policy and Relevant Provisions of ERISA*

ERISA was enacted in order to protect employee pension and retirement plans. *See* H.R.Rep. No. 533, 93d Cong., 2nd Sess. 1, reprinted in 1974 U.S.C.C.A.N. 4639, 4639 ("The primary purpose of the bill is the protection of individual pension rights...."). One of the ways ERISA accomplishes this goal is "by setting forth certain general fiduciary duties applicable to the management of [such] plans." *Varity Corp. v. Howe*, 516 U.S. 489, 496, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). In relevant part, ERISA provides that "a person is a fiduciary with respect to a plan to the extent" that he or she "exercises any discretionary authority or discretionary control respecting management" of the plan, or "has any discretionary authority or discretionary responsibility in the administration" of the plan. 29 U.S.C. § 1002(21). The fiduciary duties at issue in this case are the duty of loyalty and the duty to avoid self-dealing.

Under ERISA, the duty of loyalty is expressed as follows:

(1)[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries....

29 U.S.C. § 1104(a)(1)(A)(i). The prohibition against self-dealing provides that "[a] fiduciary with respect to a plan shall not ... deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1). The district court found that Hancock's breaches of its fiduciary duties implicated both the duty of loyalty and the duty to avoid self-dealing. *Judgment Opinion*, 122 F.Supp.2d at 459–60.

### II. *Hancock's Arguments on Appeal*

Hancock raises six arguments on appeal: (1) that it had no fiduciary duty to grant Sperry's 1982 request for a rollover of free funds; (2) that it had no fiduciary duty to revalue the LOF; (3) that it did not breach a fiduciary duty by collecting the 1% risk charge as provided for in the Contract; (4) that it did not breach fiduciary duties with respect to investment and allocation decisions; (5) that the district court's calculation of damages resulting from Hancock's refusal to permit the rollover of free funds was erroneous; and (6) that the district court awarded attorneys' fees without making the necessary findings required under ERISA. We address these arguments seriatim.

### A. *Hancock's Refusal to Allow Sperry to Withdraw Free Funds*

■■■ Hancock first argues that "the fact that [it] has certain fiduciary duties as to

the free funds does not mean that it had a fiduciary obligation to agree to an extra-contractual transfer of them." We agree.

It is law of the case that Hancock stood in a fiduciary relationship to Sperry with respect to the free funds. In affirming our decision so concluding, the Supreme Court squarely held that "ERISA's fiduciary obligations bind Hancock in its management of [the free] funds." *Supreme Court,* 510 U.S. at 94, 114 S.Ct. 517. Thus, it is incontrovertible that Hancock was required to exercise its managerial discretion with respect to the free funds in accordance with ERISA's fiduciary duty provisions. The primary question presented on this appeal is whether Hancock's general fiduciary duty includes an obligation to release free funds to Sperry in a manner different from that specified in the Contract. We conclude that neither the language nor the policy of ERISA support the imposition of a duty that would require Hancock to agree to Sperry's request for an extra-contractual rollover. Indeed, we find that the establishment and administration of employee retirement plans would be undermined by the district court's determination.

ERISA does not expressly address whether a fiduciary under the statute has an obligation to agree to a request by a plan trustee or settlor that contradicts specific bargained-for provisions of the plan's governing documents. ERISA instead merely states that a person is a fiduciary with respect to a plan "to the extent" that he or she exercises discretion over the management of the plan. 29 U.S.C. § 1002(21). We find that this language and case law interpreting ERISA fiduciary standards generally lead to the conclusion that Hancock was not acting in a fiduciary capacity when it refused Sperry's request for an extra-contractual rollover of free funds.

The district court reached the opposite conclusion, reasoning as follows:

Hancock refused to return Plan assets to the Trust when the Trust sought to use the rollover procedure in 1982 to withdraw accumulated free funds. The Trust felt it could get a better return by investing the excess funds elsewhere, but Hancock refused to return the Plan assets because of its cash flow problems. Instead, Hancock exercised its discretion to terminate the rollover procedures that had enabled the Trust to withdraw a total of $12 million prior to 1982. Clearly, Hancock put its own interests and cash flow needs ahead of the interests of the Plan and its beneficiaries. By doing so, Hancock violated its obligations under ERISA.

*Judgment Opinion,* 122 F.Supp.2d at 459–60. The district court's conclusion is flawed in three respects.

First, the district court is implicitly defining ERISA's use of the word "discretion" to include any decision a plan administrator could conceivably make. In other words, the court found Hancock's refusal to consent, because it *could have* consented, to be a discretionary act. We disagree with this interpretation. Here, Hancock did not contractually or otherwise retain "discretion" over whether or on what terms to permit a rollover of free funds; instead, the opposite is true: Hancock surrendered that discretion when it agreed to the provision in the amended Contract that provided for a specific rollover mechanism. Of course, Hancock could choose to waive the contractual requirement, just as could any party to any contract, but that cannot mean that Hancock had an *obligation* to do so. Were we to accept the district court's conclusion, there would be no limit to the scope of a fiduciary's duties under ERISA because a plan administrator would be in breach of his duties whenever

he rejects a request by a plan trustee that is contrary to the parties' agreed-upon terms for operation of the plan. We cannot countenance such a broad reading of the scope of ERISA's fiduciary duties.

 As this Court has observed, "a person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only 'to the extent' that he has or exercises the described authority or responsibility." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir.1987); *see also Siskind v. Sperry Ret. Program, Unisys.*, 47 F.3d 498, 505 (2d Cir.1995) ("[O]nly when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration," does a person become a fiduciary under ERISA.). We do not believe that "discretionary authority" can be read to include any concession a plan administrator could gratuitously make to a plan's trustee. We conclude instead that "[t]he 'management or disposition' language in ERISA refers to the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on." *Johnson v. Georgia–Pacific Corp.*, 19 F.3d 1184, 1189 (7th Cir.1994). Thus, we find that Hancock's refusal to permit Sperry's request for an extra-contractual rollover of free funds was not an exercise of "discretionary authority" over the Plan and therefore did not implicate its fiduciary duties under ERISA.[3]

The second problem with the district court's holding is its characterization of Hancock's refusal to permit the extra-con-

tractual rollover as a "terminat[ion of] the rollover procedures." *Judgment Opinion*, 122 F.Supp.2d at 459. Hancock's gratuitous acquiescence to Sperry's three prior requests for an extra-contractual rollover cannot be construed as having established a "rollover procedure." In point of fact, the only rollover procedure in place was the one agreed to contractually by the parties, which Sperry sought to avoid by its requests. Therefore, Hancock's refusal to permit a fourth extra-contractual rollover could not have been the termination of a procedure; it was instead merely adherence to the terms of the Contract, entered into freely by both parties.

 Third, Hancock's stated reason for refusing Sperry's fourth request for an extra-contractual rollover—its own cash flow problems—does not constitute, as found by the district court, a breach of its fiduciary duty of loyalty. Again, we reject such a broad interpretation of ERISA's fiduciary duties. A plan administrator must be permitted to consider its own legitimate business interests when deciding whether to gratuitously grant a request by a plan trustee, particularly when the request diverges from the terms agreed to by the parties. ERISA's fiduciary duty provisions cannot be interpreted as requiring plan administrators to agree to any and all requests made by a plan trustee because the economy has moved in a direction that, at a given moment, makes adherence to bargained-for contract provisions less attractive.

The essential difficulty of this case, unresolved explicitly by ERISA, is the rela-

---

**3.** The district court also found that Hancock's decision in 1982 to terminate payments of non-guaranteed benefits was "discretionary," and impliedly a breach of its fiduciary duty. *Judgment Opinion*, 122 F.Supp.2d at 461. Requests for non-guaranteed benefits, like requests for rollovers, were a method by which Sperry sought extra-contractual access to free funds. For the same reasons that we find Hancock's refusal to allow withdrawal of the free funds did not constitute a breach of its fiduciary duties, neither did Hancock's decision to discontinue payments of non-guaranteed benefits.

tionship between provisions contained within a retirement plan's governing documents and the fiduciary obligations imposed on plan administrators by the statute. One statutory provision touches on this question: ERISA provides that "a fiduciary shall discharge his duties ... in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the [fiduciary duty] provisions of [ERISA]." 29 U.S.C. § 1104(a)(1)(d); *see also Cent. States v. Cent. Trans., Inc.*, 472 U.S. 559, 568, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985) ("[T]rust documents must generally be construed in light of ERISA's policies."). We find nothing in the Contract that is inconsistent with ERISA's fiduciary duty obligations. As the Seventh Circuit has explained,

> [I]f a specific term (not a grant of power to change terms) is bargained for at arm's length, adherence to that term is not a breach of fiduciary duty. No discretion is exercised when an insurer merely adheres to a specific contract term. When a contract, however, grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary.

*Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 737 (7th Cir.1987).

■ We agree that where parties negotiate the terms of a contract governing a retirement plan, the adherence to those terms by a plan administrator cannot constitute a breach of its fiduciary duties, barring a grant of discretionary authority to the fiduciary. Here, the Contract did not grant to Hancock the discretionary authority to permit or refuse withdrawal of the free funds whenever requested by Sperry. In fact, by specifically providing the sole means for withdrawal of free funds in accordance with the mark-to-mar-ket formula, the Contract stripped Hancock of any discretionary authority it might otherwise have had in this respect. Hancock could not, for instance, refuse to permit Sperry to withdraw free funds in accordance with the contractual provision. Similarly, Hancock could not insist on book value or some other extra-contractual means of valuation for such withdrawal. Neither can Sperry.

■ Sperry and Hancock agreed at arm's length to the formula under which Sperry could withdraw free funds. The exercise of that provision became unattractive to Sperry through no fault of Hancock: the free funds became more valuable simply as a result of outside market forces. We conclude, in accord with the Seventh Circuit, that the scope of an insurer's fiduciary duty is defined by the contract entered into at arm's length unless that contract vests in the insurer discretionary authority.

It is important to understand the practical consequences of a ruling affirming the district court's conclusion on this issue. To adopt a rule by which ERISA fiduciaries have a duty to agree to requests that are contrary to the provisions of plan documents would render meaningless the negotiation of the terms of the agreement between the parties and would likely destroy the market for long-term ERISA contracts. Plan trustees, such as Sperry, would have no reciprocal obligation to grant requests of plan administrators, such as Hancock, when the economic climate moved in a way that disadvantaged the latter. Fiduciaries therefore would be unwilling to enter into contracts for retirement plans governed by ERISA because of the potential economic losses they would face. Public policy would not be served by the definition of fiduciary duties articulated by the district court.

For all these reasons, we find that Hancock's refusal to permit Sperry to roll over free funds under a formula different from that called for in the Contract did not constitute a breach of its fiduciary duties under ERISA.

B. *Hancock's Refusal to Revalue Plan Liabilities*

■■■ Hancock next argues that its refusal to revalue the Plan's liabilities did not constitute a breach of its fiduciary duties because (1) the manner in which the LOF was calculated is specified in the Contract and it had no fiduciary duty to renegotiate that provision; (2) the LOF was the contractual reserve for the guaranteed portion of the Plan's funds and thus exempt from ERISA's fiduciary duty obligations; and (3) computation of the LOF does not involve any management or disposition of Plan assets and is therefore not within the scope of its fiduciary duties. We agree with Hancock in all respects. The 1968 amendment required that the Plan be maintained at 105% of the LOF. The LOF for pre–1968 cancelled annuities was calculated using interest rate assumptions of 2.5% or 3%, depending on when the benefits were first guaranteed, and using the 1937 Standard Annuity and 1951 Group Annuity Mortality Tables. *Judgment Opinion*, 122 F.Supp.2d at 450. Because interest rates had drastically increased since 1968, these assumed rates of return had the effect of significantly overstating the Plan's liabilities. Sperry requested that Hancock change its method for calculating the LOF and Hancock refused. *Id.* at 452. The district court found that Hancock's refusal to revalue the LOF constituted a breach of its fiduciary duties under ERISA. *Id.* at 460. We disagree.

Just as Hancock had no fiduciary duty to permit Sperry to withdraw free funds in an extra-contractual manner, it likewise had no fiduciary duty to revalue the LOF merely because such revaluation would benefit Sperry. For the same reasons discussed in Part II.A. *supra*, Hancock did not breach its fiduciary duties by adhering to the bargained-for terms of the Contract rather than gratuitously granting Sperry's request.

Second, the LOF is the contractual reserve for the pension benefit obligations *guaranteed* by Hancock; in other words, the LOF provision specifies the precise amount that Hancock is required to pay to beneficiaries regardless of the performance of the Plan. The district court's ruling ignores this important legal distinction. As discussed at length in the previous opinions in this case, ERISA expressly exempts from the fiduciary obligations it imposes the management of guaranteed funds. *See, e.g., Second Circuit*, 970 F.2d at 1143–46. For this independent reason, Hancock could not have breached a fiduciary duty to Sperry in refusing to revalue the LOF, because that calculation pertained to the guaranteed portion of the Plan and therefore no such duty ever arose.

Third, Hancock's refusal to revalue the LOF did not trigger ERISA's fiduciary obligations because computation of the LOF does not implicate the management or disposition of a pool of assets. *Georgia–Pacific Corp.*, 19 F.3d at 1189. As discussed above, rather than exercising any discretionary authority over the Plan, Hancock merely chose to adhere to contractual terms that are not inconsistent with ERISA's fiduciary duty obligations. Because Hancock had no fiduciary duty to agree to Sperry's request to revalue the LOF, Hancock could not be in breach of that duty.

We therefore conclude that Hancock's refusal to revalue the LOF did not consti-

tute a breach of ERISA's fiduciary obligations.

### C. Hancock's Collection of the 1% "Risk" Charge

■ Hancock next argues that its collection of a 1% risk charge on the net investment income allocated to the Plan did not breach its fiduciary duties. We again agree with Hancock.

The district court found that Hancock's collection of its agreed-upon compensation under the Contract was a breach of its fiduciary duties, stating that "Hancock did not actually face any risk with respect to the free funds during this time period . . . because it was 'sufficiently protected' by other provisions of [the Contract] so that it was not at 'material risk.' Therefore, the excess risk charges collected by Hancock during this time period constituted overcompensation." *Judgment Opinion*, 122 F.Supp.2d at 452 (citation to the record omitted). We disagree with this determination.

■ The 1% risk charge was Hancock's direct compensation under the Contract. Surely, Hancock was entitled to charge Sperry a fee for its administration of the Plan. As with all the provisions of the Contract, the parties negotiated at arm's length the terms of Hancock's compensation and agreed on a fee of 1% of the net investment income. Again, the changed economic climate may have rendered Hancock's compensation more lucrative than what the parties expected at the time of contracting. Nonetheless, there is nothing inherently inconsistent with the Contract's compensation provision and

ERISA's fiduciary duty obligations. As we have held, "a person is not an ERISA fiduciary with respect to the terms of the agreement for his compensation." *Krear*, 810 F.2d at 1259.

Thus, we reverse the district court's ruling that Hancock breached its fiduciary duties by collecting the 1% risk charge.

### D. Hancock's Investment and Allocation Decisions

Hancock argues that the district court erred in holding that Hancock's investment and allocation decisions breached its fiduciary duties. We reject the argument in part and leave the balance of the argument for further development.

As an initial matter, it is worth noting that the district court's determinations in this area are fundamentally different in one important respect from its conclusions regarding the rollover request, the revaluation of the LOF, and the risk charge. Each of these latter conclusions addressed aspects of the relationship between the parties specified by the Contract, and thus were outside the scope of Hancock's fiduciary duties. By contrast, the Contract did not specify how Hancock would invest Sperry's funds in its General Account, nor how it would allocate the returns on its investments and its expenses among its various client accounts such as the Plan. We believe that such transactions represent the quintessential "discretionary management" decisions that ERISA seeks to protect. Thus, Hancock had a fiduciary duty to Sperry with respect to its investment and allocation decisions.[4]

4. Hancock claims that ERISA's prohibition against self-dealing, 29 U.S.C. § 1106, does not apply to an insurer's general account investments and that because the district court's decision is unclear as to whether Hancock's investment decisions violated § 1106 as op-

posed to § 1104, the duty of loyalty provision, remand is necessary for such a determination. This argument is without merit. The district court's opinion on this matter is not at all unclear. The court held that all of its conclusions regarding breaches of fiduciary duties

### 1. *Fixed and Frozen Assets*

 The district court concluded that Hancock violated its fiduciary duties as a result of its investment decisions in "fixed and frozen" assets, which consistently performed poorly. *Judgment Opinion*, 122 F.Supp.2d at 455. Hancock argues that "the mere happenstance of an investment allocation that resulted in reduced income cannot suffice to establish a breach of fiduciary duty" and that "those investments were expected to bear fruit only in the long term." Hancock's argument cannot withstand scrutiny.

The district court's findings with regard to Hancock's investments in fixed and frozen assets, none of which are contested by Hancock, clearly demonstrate violations of both Hancock's duty to avoid self-dealing and its duty of loyalty. The court found that Hancock charged itself below-market rental rates on its home office properties. This breached Hancock's fiduciary duty to avoid self-dealing because Hancock "deal[t] with the assets of the [P]lan in [its] own interest." 29 U.S.C. § 1106(b)(1).

Moreover, Hancock chose not to allocate any of these investments to the portion of the General Account for which it bore the investment risk. Instead, Hancock allocated those investment decisions to the participating group pension contracts, including the Plan, for which the policyholders bore the investment risk. *Id.* at 454. As a result, the fixed and frozen asset investments significantly drove down the rate of return for the Plan. The court found that the allocation decisions were driven largely by a desire to benefit new customers at the expense of old clients such as Sperry.

*Judgment Opinion*, 122 F.Supp.2d at 460. Witnesses at trial, including Hancock's own group pension actuary, testified that they repeatedly "questioned the manner in which Hancock was allocating fixed and frozen income to the group pension line." *Id.* at 454. Hancock's allocation of these investments breached its fiduciary duty of loyalty because Hancock did not "discharge [its] duties with respect to [the Plan] solely in the interests of [the Plan's] participants and beneficiaries." 29 U.S.C. § 1104(a)(1). Through its fixed and frozen asset investment and allocation decisions, Hancock exercised discretionary authority in a manner that violated the exacting fiduciary standards of ERISA.

We therefore affirm the district court's holding that Hancock's investment and allocation decisions regarding fixed and frozen assets breached its fiduciary duties.

### 2. *Cost of Borrowing*

 The district court also held that Hancock's decision to allocate costs of borrowing to the Plan breached its fiduciary duties under ERISA. The district court appears to have applied the wrong standard in analyzing this issue. The court found that "[t]he group pension line . . . was always profitable and the cash flow associated with the [Plan] was always positive." *Judgment Opinion*, 122 F.Supp.2d at 455. The court therefore concluded that the cost of borrowing allocation was improper because "the loans were necessitated not by group pension but by other lines of business within Hancock." *Id.* However, business borrowing is not necessarily connected with losses. Presumably

violated both ERISA provisions. *Judgment Opinion*, 122 F.Supp.2d at 459–60. Thus, even if we were to hold that the assets in Hancock's general account are not subject to the self-dealing provision of ERISA, there is no contention that they are exempt from the

duty of loyalty provision. Because the district court clearly held that Hancock's investment and allocation decisions violated the latter duty, there is no need to remand for clarification.

many businesses, even highly profitable ones, borrow funds as a capitalization device. Hancock alleges that it borrowed money in order to make the investments in which the Plan shared; such investment expenses would be properly allocated to the Plan. Thus, the fact that the Plan was "always profitable" does not inevitably lead to the conclusion that any allocation of borrowing costs to the Plan constituted a breach of fiduciary duty. We therefore vacate the district court's ruling on this issue and remand for consideration of whether and to what extent the Plan earned income from investments that Hancock funded by borrowing.

### 3. *Indirect Expenses*

██ Hancock also allocated to the Plan litigation and lobbying expenses incurred in connection with this case. *Judgment Opinion,* 122 F.Supp.2d 456. The district court stated that these allocation decisions were "inappropriate," *id.,* and that such "exercise[ ] [of Hancock's] discretion to its own advantage while disadvantaging [the Plan] . . . violated its [fiduciary] duties under ERISA," *id.* at 460. We agree.

██ Hancock argues that "the mere negative effect of an allocation decision should not establish an ERISA breach" and that "the District Court articulated no reason why Hancock's litigation and lobbying costs should not have been allocated to [the Plan]." In support of this argument, Hancock relies on the ERISA provision that states: "Nothing in section 1106 of this title shall be construed to prohibit any fiduciary from . . . receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred . . . ." 29 U.S.C. § 1108(c)(2). This provision, entitled "Fiduciary benefits and compensation not prohibited by section 1106," does not help Hancock. The clear intent of § 1108(c)(2) is to allow a fiduciary, which is otherwise prohibited from engaging in self-dealing transactions by § 1106, to receive reasonable compensation for the administration of a retirement fund. As we stated in *Lowen v. Tower Asset Mgmt., Inc.,* 829 F.2d 1209, 1216 n. 4 (2d Cir.1987), "the services exempted under ERISA Section [1108(c)(2) ] are services rendered to a plan and paid for by a plan for the performance of plan duties." Lobbying, and litigation against plan beneficiaries or their trustees cannot be construed "plan duties."

Moreover, the parties had already agreed that the 1% risk charge would constitute Hancock's compensation for administering the Plan. Litigation and lobbying expenses associated with this case should have been funded from Hancock's compensation rather than by charging these expenses to the Plan additionally. Furthermore, to allow Hancock to effectively charge its attorneys' fees back to Sperry in this manner would circumvent the American rule that parties bear their own fees unless a court determines otherwise. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). We therefore affirm the district court's ruling that Hancock's allocation of litigation and lobbying expenses to the Plan breached its fiduciary obligations under ERISA.

### 4. *Segmentation*

██ As discussed earlier, beginning in 1982 Hancock divided its General Account into segments, or subaccounts, each of which had its own investment policy. One of the segments was "pension participating" ("par"), which was applicable to the Plan, and another was "pension non-participating" ("non-par"). For the investment year 1982, the assets allocated to par earned less than those allocated to non-

par. The district court found that this allocation decision benefitted Hancock to the detriment of the par segment, which included the Plan, and therefore violated Hancock's fiduciary duties to Sperry. *Judgment Opinion*, 122 F.Supp.2d at 456.

Hancock challenges this conclusion by explaining that "[i]n every subsequent year described in the record, the par segment outperformed non-par," and that "Hancock plainly could not know in advance that the unusual interest-rate environment of 1982 [which caused the lower earnings on the assets allocated to par] would produce a different result." In other words, Hancock is claiming that "[t]he fact that an investment turned out to be less successful than expected" cannot constitute a breach of fiduciary duty.

The unresolved question here is whether Hancock made the decision before the fact to assign investments according to a policy designed to serve client interests and whether that decision was reasonable under the circumstances. *See Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.1984) ("The court's task is to inquire whether the ... trustees, *at the time they engaged in the challenged transactions,* employed the appropriate methods to investigate the merits of the investment and to *structure the investment.*" (emphases added; internal quotation marks omitted)). Thus, rather than focusing on the *actual* performance of the segments, the district court was required to examine the reasonableness of the segmentation policy at the time it was instituted. Because it appears that the court applied an erroneous standard in its analysis of Hancock's segmentation decision, we vacate its determination of that issue and remand for reconsideration under the proper legal standard.

E. *Hancock's Remaining Arguments*

 In light of our ruling, we need not address whether the district court miscal-culated the damages resulting from Hancock's refusal to permit an extra-contractual rollover of free funds. Of course, on remand the court must determine anew the measure of damages caused by the actions that we have concluded do constitute breaches of Hancock's fiduciary duties. We reiterate that the proper measure of damages is to be calculated by determining what the Plan would have earned had Hancock exercised its discretionary authority with respect to its investment and allocation decisions in accordance with its fiduciary duties under ERISA. *See Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir.1985). Similarly, our ruling alters the landscape for determining an award of attorneys' fees. The district court must, of course, undertake a reevaluation of the propriety of awarding such fees pursuant to the factors we outlined in *Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 871 (2d Cir.1987). Finally, because Hancock's violations are significantly less extensive than the district court concluded, on remand the court must also reconsider its order removing Hancock as trustee of the Plan.

## CONCLUSION

We reverse the district court's determination that Hancock breached its fiduciary duties to Sperry when it (1) refused Sperry's request to roll over free funds; (2) refused to revalue the LOF; and (3) collected its 1% risk charge; we affirm the court's conclusions that Hancock's fixed and frozen asset investments and litigation and lobbying allocations breached its fiduciary duties to Sperry. With respect to the allocation decisions involving cost of borrowing and segmentation, we vacate and remand for further proceedings in the district court consistent with this opinion. We also vacate and remand for further

proceedings consistent with this opinion the issues of removal of Hancock as trustee, damages, and attorneys' fees.